CHARLES D. RIDENOUR, APPELLEE, V. FARM BUREAU INSURANCE COMPANY OF NEBRASKA, A MUTUAL INSURANCE COMPANY, APPELLANT.
377 N.W.2d 101

Filed December 6, 1985.   No. 84-730.

Arlen W. Langvardt of Jacobsen, Orr & Nelson, P.C., for appellant.

Charles J. Cuypers of Sherwood & Cuypers, and John E. Dier of Person, Dier & Person, for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and WOLF, D.J., and COLWELL, D.J., Retired.

CAPORALE, J.

Defendant, Farm Bureau Insurance Company of Nebraska, a mutual insurance company, appeals from the reformation of a policy of insurance issued by it so as to provide coverage for losses occasioned by the collapse of plaintiff Charles D. Ridenour's hog confinement building. Farm Bureau's assignment that the trial court erred in reforming the policy is meritorious; we therefore, without considering its other assignments of error, reverse and remand the cause with the direction that it be dismissed.

An action for reformation being equitable in nature, *Farmers Coop. Assn. v. Klein*, 196 Neb. 180, 241 N.W.2d 686 (1976), we review this matter de novo on the record, taking into consideration the fact that the trial court saw and heard the witnesses and accepted one version of the facts rather than

another. Neb. Rev. Stat. § 25-1925 (Reissue 1979); *Hulse v. Schelkopf*, 220 Neb. 617, 371 N.W.2d 673 (1985).

A review of the evidence with that principle in mind reveals that in May of 1976 plaintiff had a hog confinement building erected on the farm he leased. In July of 1977 he purchased a "Country Squire" insurance policy issued by Farm Bureau. That policy was renewed from year to year and was in force and effect at the time the aforesaid hog confinement building collapsed on August 10, 1982.

The declarations pages for the year from July 25, 1982, to July 25, 1983, and the policy language do not provide coverage for losses resulting from a collapse of the hog confinement building, but do provide coverage for certain other direct losses of the structure up to a limit of $35,000, less a deductible amount of $50. While the policy does make protection available for loss resulting from the collapse of plaintiff's residence, plaintiff did not purchase such coverage.

The collapse resulted in destruction of the confinement building and in the death of some of the hogs within it. Farm Bureau denied liability for the resulting losses, and this suit followed.

Plaintiff testified that in the first part of February 1982, he, his wife, Thelma, and his son, Tom, met with Tim Moomey, an agent who sold and serviced policies for Farm Bureau, in the Ridenour kitchen. The record reflects that Moomey had graduated from Kearney State College in 1975 and immediately became an agent for Farm Bureau. He thereafter received specialized insurance business training at various seminars. According to plaintiff, the purpose of the meeting was "[t]o discuss the coverage of our hog confinement building." Plaintiff had become aware that his hog supplier had experienced some trouble with a building like his, and he became concerned about the soundness of his own building. He testified that he therefore wanted insurance to cover his losses should the building collapse. Plaintiff told the court he advised Moomey that "we wanted to be covered for the collapse of the building." Plaintiff stated Moomey told him that "under the blanket plan we had we was covered for the hogs; and in the Country Squire we was covered for the collapse." (It appears

that the subject policy was the only one in force. It contains, as coverage D, "Blanket Farm Personal Property," which provides protection for losses resulting from the death of hogs from certain designated causes but not from the collapse of a structure.) Plaintiff also recalled that at this meeting his wife, at Moomey's request, provided Moomey with the number of hogs then in confinement.

Thelma Ridenour testified that she called Moomey in February 1982 to ask him to meet with the Ridenours "to talk about our coverage on the hogs and to see if we were covered for specific things that we had been reading and hearing about." She explained that their hog supplier had talked to her husband and son about the floor slats collapsing and hogs drowning in the pit in connection with his confinement building. According to her, the Ridenours wanted to know if their insurance policy covered such occurrences. She testified further that at the February 1982 meeting her husband inquired whether there was coverage for asphyxiation and drowning of the hogs in case the slats would collapse. She recalled that Moomey said such coverage was provided by the blanket policy. She, in addition, remembered that her husband also asked to be covered for losses caused by a collapse of the building, and Moomey said such coverage was provided by the Country Squire policy. Thelma Ridenour confirmed that at this meeting she reported to Moomey the number of hogs then in the confinement building. She also reported their weight.

Tom Ridenour testified that he was present at the February 1982 meeting between his parents and Moomey. He recalled that his father told Moomey about the problems the hog supplier had with his confinement building and that his father asked Moomey if their insurance covered asphyxiation of the hogs, collapse of the slats, and collapse of the building. According to Tom Ridenour, Moomey said those events were covered.

Plaintiff further testified that he had a second meeting with Moomey in April 1982, at which time only the two of them were present. On this occasion Moomey filled out a checklist, which plaintiff signed. The list makes no reference to collapse losses on any structure and recites that items not shown on the

declarations pages are not insured. According to plaintiff, however, Moomey was in a hurry and the checklist was not discussed. Nonetheless, plaintiff admits that he did sign the checklist after the items listed were read off to him. As a result of this April meeting, the dollar amount of certain coverages on the hog confinement building, other than collapse, was increased from $25,000 to $35,000.

Plaintiff and his wife both testified they had not completely read the Country Squire policy. They did not understand the wording and relied instead on Moomey to interpret it for them.

On the other hand, Moomey, who had ended his relationship with Farm Bureau in November of 1982, testified that at no time prior to the collapse of the confinement building did the Ridenours request that the hogs and building be insured so as to cover losses resulting from its collapse. In fact, Moomey knew collapse coverage was not available from Farm Bureau for outbuildings such as the hog confinement structure. As of the time of trial, mid-1984, Moomey knew there were two or three companies which provided such coverage as of that time, but he did not know whether such insurance was available from those companies at the time of the collapse.

Moomey recalled meeting with plaintiff in April of 1982, at which time they did a "farm review." That is, Moomey went through an inventory of the farm and reviewed the declarations pages with plaintiff "line by line [to] make sure everything was the way they wanted it." Plaintiff and Moomey also reviewed the checklist discussed earlier. Moomey stated that his procedure was to go through the checklist and explain the coverage, then check off each type desired by the insured.

Plaintiff testified that on August 11, 1982, the day after the confinement building collapsed, Moomey went to the Ridenour farm and informed them he was sorry but the home office said there was no coverage.

Moomey testified that upon receiving a call from one of the Ridenours on the date of the collapse, he caused his secretary to prepare a notice of loss report for submission to Farm Bureau's home office describing the property lost, the cause of the loss, and the amount of insurance coverage claimed for each item. He also assigned an adjuster to inspect the property. Moomey

and the adjuster discussed the fact that there was no coverage for the loss.

The principle upon which plaintiff relies is that reformation is decreed in order to effectuate the real agreement of the parties when a written instrument does not represent their true intent. *Waite v. Salestrom*, 201 Neb. 224, 266 N.W.2d 908 (1978); 66 Am. Jur. 2d *Reformation of Instruments* § 1 (1973).

In this jurisdiction reformation may be decreed where there has been a mutual mistake or where there has been a unilateral mistake caused by the fraud or inequitable conduct of the other party. In such events 'the erroneous written agreement is conformed to the antecedent agreement of the parties; that is to say, to the agreement entered into prior to the execution of the erroneous written agreement. *Johnson v. Stover*, 218 Neb. 250, 354 N.W.2d 142 (1984); *Waite v. Salestrom, supra*; *Oft v. Dornacker*, 131 Neb. 644, 269 N.W. 418 (1936).

To obtain reformation the evidence must be clear, convincing, and satisfactory. *Johnson v. Stover, supra*. Such evidence is present when there has been produced in the trier of fact a firm belief or conviction that a fact to be proved exists. See *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985).

Moreover, there is a strong presumption that a written instrument correctly expresses the intention of the parties to it. *Johnson v. Stover, supra*; *Beideck v. National Fire Ins. Co.*, 139 Neb. 171, 296 N.W. 873 (1941).

The record does not produce in us a firm belief or conviction that there was a mutual mistake of fact. Moomey was a trained and experienced insurance agent who, after he had no relationship with Farm Bureau, testified he knew the coverage claimed by plaintiff was not available from Farm Bureau and who denied representing that such coverage existed under the policy. Plaintiff argues that Moomey's expression of sorrow over the fact that Farm Bureau's home office said there was no coverage, coupled with the facts that he caused a notice of loss report to be prepared and arranged for an adjuster to inspect the property, establishes that Moomey did think collapse coverage for the hog building existed. We conclude otherwise. Prudence dictated that plaintiff's claim be noted and

investigated. Investigation of this claim to determine the facts does not necessarily imply a thought that coverage exists. Neither does an expression of regret that the home office said coverage does not exist necessarily imply an earlier belief by Moomey that there was coverage. It may as easily imply regret at the confirmation of what Moomey already knew.

Any mistake which may have existed was therefore one made only by plaintiff. Under such a circumstance he must, in order to recover, clearly, convincingly, and satisfactorily establish that the mistake was either the result of fraud on the part of Farm Bureau or due to Farm Bureau's inequitable conduct.

Plaintiff concedes in his brief that there was no fraud (Brief for Appellee at 8), but argues that Farm Bureau engaged in inequitable conduct by not delivering the declarations pages until after the loss. The late delivery of the declarations pages is more than adequately explained, however, by the fact that plaintiff was tardy in paying his premium. Moreover, since plaintiff admits he did not read the policy, he cannot be heard to complain that not having the declarations pages deprived him of an opportunity to discover that he had no collapse coverage on his hog confinement building.

The nature of the conflict in the evidence in this case is not unlike that present in two earlier cases which resulted in a denial of reformation. In *Beideck v. National Fire Ins. Co., supra*, the insureds testified they told the agent that as they expected to make a temporary move to Wisconsin, they wanted fire insurance to cover their personal belongings wherever the property might be located. They also claimed that the agent agreed to provide such coverage and assured them when he delivered the policy that it contained the coverage they had requested. The agent, on the other hand, testified he did not tell the insureds that they had the coverage in question but, instead, told them that the type of coverage they wanted was not available. In denying reformation this court noted that there was no evidence of mutual mistake and that if the insureds were to recover, it must be on the basis of fraud. The court then concluded that the evidence, being in sharp and irreconcilable conflict, was insufficient to establish fraud. The insured in *Du Teau Co. v. New Hampshire Fire Ins. Co.*, 156 Neb. 690, 57

N.W.2d 663 (1953), sought to reform an automobile dealer's insurance policy so that it would cover a loss occasioned when it voluntarily parted with an automobile because of the fraud of a third party. The insured's manager, who had purchased the policy, testified that the insurance agent told him there would be coverage in the event of any loss, particularly of the type in question in the case. The insurance agent, on the other hand, testified that he made no such representations to the manager. We once again observed that the evidence was sharply and irreconcilably conflicting and, citing *Beideck v. National Fire Ins. Co.*, 139 Neb. 171, 296 N.W. 873 (1941), held that the evidence was insufficient to support a reformation of the contract.

The principal cases relied upon by plaintiff in which reformation was decreed are distinguishable from the case presently before us. *Heikes v. Farm Bureau Ins. Co.*, 181 Neb. 827, 151 N.W.2d 336 (1967), also involved a dispute concerning the Country Squire policy. Therein, the insureds' potatoes had been destroyed by fire, an excluded peril. The insureds had spoken with their insurance agent about fire coverage for their potato storehouse and some personal property. The agent, after inspecting the storehouse, informed them that their policy covered stored potatoes against fire and commented at the scene of the fire that coverage was ample under the coinsurance clause. Moreover, although the agent had sold 60 Country Squire policies, he did not know that root crops and vegetables were excepted from fire coverage. This court held that reformation was proper because there was clear and convincing proof that the insureds relied in good faith upon the agent's misrepresentations. Indeed, in *Heikes* there was no evidentiary conflict as to what the agent represented; consequently, the only conclusion which could have been reached was that there had been a mutual mistake. That was also the situation presented by *Corrigan v. Fireman's Fund Ins. Co.*, 180 Neb. 13, 141 N.W.2d 170 (1966), and *Robinson v. Union Automobile Ins. Co.*, 112 Neb. 32, 198 N.W. 166 (1924), in which the agents testified that they had misinformed the insureds about the coverages provided.

In the case presently before us, however, the evidence falls

short of overcoming the presumption that the policy as written correctly expresses the intention of the parties at the time it was renewed.

Accordingly, the decree of the trial court is reversed and the cause remanded for dismissal.

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.