J. J. SCHAEFER LIVESTOCK HAULING, INC., APPELLEE, V. GRETNA STATE BANK, A NEBRASKA BANKING CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLANT, PARKS & PARKS AUCTION SALES MANAGERS, INC., A NEBRASKA CORPORATION, ET AL., THIRD-PARTY DEFENDANTS, APPELLEES.
THE WAGGONERS TRUCKING, APPELLEE, V. GRETNA STATE BANK, A NEBRASKA BANKING CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLANT, PARKS & PARKS AUCTION SALES MANAGERS, INC., A NEBRASKA CORPORATION, ET AL., THIRD-PARTY DEFENDANTS, APPELLEES.
GRETNA STATE BANK, A NEBRASKA BANKING CORPORATION, APPELLANT, V. PARKS & PARKS AUCTION SALES MANAGERS, INC., A NEBRASKA CORPORATION, ET AL., APPELLEES.

428 N.W.2d 185

Filed August 26, 1988.    Nos. 86-353, 86-354, 87-113.

Debra R. Nickels and E. Terry Sibbernsen, of Welsh, Sibbernsen & Roach, for appellant.

James F. Fenlon and William G. Stockdale, of Harris, Feldman Law Offices, for appellees Parks & Parks Auction and Patricia Parks.

HASTINGS, C.J., SHANAHAN, and FAHRNBRUCH, JJ., and RILEY and OTTE, D. JJ.

HASTINGS, C.J.

This appeal involves three consolidated civil actions from the district court for Sarpy County for amounts allegedly due on promissory notes. The court found against Gretna State Bank on the issues of reformation, equitable subrogation, discharge of the notes, and a timely filing of a claim against an estate. The bank appeals in each case.

The first two actions, cases Nos. 86-353 and 86-354, were originally filed by plaintiffs, J. J. Schaefer Livestock Hauling, Inc., and The Waggoners Trucking (hereinafter consignors), against Gretna State Bank (hereinafter bank). The plaintiffs were auction consignors who retained an auctioneer, Parks & Parks Auction Sales Managers, Inc. (hereinafter P & P), to sell certain items, vehicles, at auction. P & P maintained several accounts at the bank, including a general operating account into which it deposited proceeds of approximately $700,000 on September 17, 1984, from the auction. Any consignors were then usually paid about 15 days after the deposits were made.

P & P was in the habit of using proceeds of a recent auction to pay off consignors of an earlier auction. Patricia Parks had discussed with her husband, Charles (Charlie) Parks, president of P & P, that this was wrong, and he agreed that P & P was in jeopardy. This condition continued until his death.

Pursuant to longstanding practice, the bank would set off debts owed to it by P & P against the account. A debt of $165,000 was evidenced by two promissory notes and personally guaranteed by Charlie Parks and his wife, Patricia, also an officer of the corporation. An amount of $115,000 was loaned to Charlie on August 6, 1984, and earlier guaranteed by him on July 13, 1978. An amount of $50,000 was guaranteed by

Patricia on May 1, 1978. Her name was then Penny A. Hancock. Each promissory note provided as follows: "SET-OFF — Lender may at any time before or after default exercise its right to set-off all or any portion of the indebtedness evidenced hereby against any liability or indebtedness of the Lender to the Borrower . . . without prior notice to the Borrower."

An understanding or verbal agreement existed between the bank's president, Ronald Suhr, and P & P as to how the accounts would be handled. It was with this authority that the setoff was taken. Moneys were deposited by P & P into its operating account, and then the bank would transfer these funds into an investment account to earn interest for a couple of weeks until the funds needed to be returned to the operating account to cover checks P & P had written. If the bank took a setoff and there were insufficient funds in the operating account to cover checks, a new loan or loan advances would be made to P & P.

On September 19, 1984, the bank took a setoff against the account in the amount of $167,131.36. The promissory notes, although not yet due, were marked "PAID" and returned to P & P. The bank also transferred $300,000 from the general operating account to the investment (money market) account.

No other indebtedness existed between the bank and P & P after September 19, 1984. However, a different corporation, in which Charlie Parks had an ownership interest, Nepco, Inc., still owed the bank.

Charlie Parks had died earlier that day, at approximately 1:30 a.m. The bank's president and cashier, Suhr, was notified of Charlie's death by a call from Mrs. Parks on the morning of the 19th, at approximately 10 a.m. He testified that the payments on the notes were done prior to the phone call, before he was aware of Charlie's death. The money was taken out right away that morning by Stephen Ingram, vice president and the second of two officers of the bank. Ingram testified that he transferred the funds before he heard about Charlie's death.

The funds in Charlie's estate were insufficient to pay the consignors the amounts owed from the auction. The consignors sued the bank for conversion of P & P's funds, alleging the

funds were held in trust for them, free and clear of any bank right of setoff. Summary judgment was granted for the consignors on the issue of liability. Ultimately, a settlement agreement was reached, with the bank paying the consignors the sum of $198,417.04.

The third-party action is essentially a claim for indemnity, wherein the bank sought to recover these amounts and filed petitions against third-party defendants, P & P and its individual guarantors, for amounts due on the promissory notes. The court dismissed the action, ruling that the bank had no right to equitable subrogation for lack of a common liability and no right to reformation of the notes for lack of mutual mistake or fraud.

Case No. 87-113 is one at law arising from the same core of operative facts in which the bank sought amounts due on the notes from P & P. Summary judgment was granted for P & P. The court found that the promissory notes and the obligations they represented were discharged by the notation of "PAID" on the notes and that the claim against the estate of Charlie Parks was not timely filed.

Claims had been filed against the estate by the bank in the amounts of $570,400 and $27,253.49 on April 22, 1985. The claims were disallowed by Mrs. Parks, the personal representative.

The bank prosecutes this appeal.

The issues on appeal are (1) whether the district court erred in dismissing the third-party action and in finding that the doctrines of equitable subrogation to avoid unjust enrichment and mutual mistake did not apply; and (2) whether the district court erred in granting summary judgment for P & P and in finding that the notes had been discharged and a claim was not properly filed against the estate.

The third-party action, seeking both reformation and equitable subrogation, was tried and dismissed. An action for reformation is equitable in nature. *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986). In such a case this court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where the credible evidence is in conflict on a

material issue of fact, we consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988).

The general standard of review is that dismissal by a district judge will not be reversed on appeal if it was done in the exercise of sound discretion. *Estate of Tetherow v. State*, 193 Neb. 150, 226 N.W.2d 116 (1975); *Neumeyer v. Omaha Public Power Dist.*, 188 Neb. 516, 198 N.W.2d 80 (1972).

" 'A judicial abuse of discretion does not denote or imply improper motive, bad faith, or intentional wrong by a judge, but requires the reasons or rulings of a trial judge to be clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition through a judicial system.' "

*Fredericks v. Western Livestock Auction Co.*, 225 Neb. 211, 216, 403 N.W.2d 377, 381 (1987); *Newton, supra*; *Bump v. Firemens Ins. Co.*, 221 Neb. 678, 380 N.W.2d 268 (1986).

Our de novo review of the record should search for the alleged fraud and/or mutual mistake, which must be shown by clear, convincing, and satisfactory evidence. *Newton, supra*; *Ridenour v. Farm Bureau Ins. Co.*, 221 Neb. 353, 377 N.W.2d 101 (1985). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *Newton, supra*.

Since the matter of case No. 87-113 arises from the entering of summary judgment, we are obligated to view the evidence in the light most favorable to the party against whom the motion is directed and to give that party the benefit of all reasonable inferences which may be drawn therefrom. *Lowry v. State Farm Mut. Auto. Ins. Co.*, 228 Neb. 171, 421 N.W.2d 775 (1988); *Ford v. American Medical International*, 228 Neb. 226, 422 N.W.2d 67 (1988). Moreover, summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the

moving party is entitled to judgment as a matter of law. *Lowry, supra*; *Stodola v. Grunwald Mechanical Contractors*, 228 Neb. 301, 422 N.W.2d 341 (1988).

Summary judgment is an extreme remedy and should be awarded only when the issue is clear beyond all doubt. *Luschen Bldg. Assn. v. Fleming Cos.*, 226 Neb. 840, 415 N.W.2d 453 (1987). "The burden is on the moving party to show that no issues of material fact exist, and unless the party can conclusively do so, the motion must be overruled." *Janssen v. Trennepohl*, 228 Neb. 6, 10, 421 N.W.2d 4, 7 (1988). The court is to examine the evidence, not to decide any issue of fact, but to discover if any real issue of fact exists. *Id*.

## DISCHARGE OF THE NOTES

It is undisputed that the two promissory notes were stamped "PAID" and returned to P & P. In case No. 87-113 the district court found that the marking of the words "Paid 9/19/84" on the promissory notes in the amounts of $115,000 and $50,000 and returning them to the maker constituted a discharge of the debt under the Uniform Commercial Code. The court further found that because the notes were discharged, the guaranties executed by Patricia Parks and Charles Parks were likewise discharged.

Specifically, Neb. U.C.C. § 3-605 (Reissue 1980) provides:

> (1) The holder of an instrument may even without consideration discharge any party
>
> (a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or
>
> (b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.
>
> (2) Neither cancellation nor renunciation without surrender of the instrument affects the title thereto.

The plain language of § 3-605(1)(b) is controlling here and provides that an instrument may be discharged by a written renunciation "*or by surrender of the instrument to the party to be discharged*." (Emphasis supplied.) The statute provides that

this result will occur even if such action is taken *"without consideration."* (Emphasis supplied.)

The bank points to Neb. U.C.C. § 1-103 (Reissue 1980) to note that the law of mistake should supplement § 3-605 regarding discharge. It refers us to *Guaranty Bank & Trust Co. v. Dowling*, 4 Conn. App. 376, 494 A.2d 1216 (1985), where a note was erroneously canceled and surrendered. After the mistake was pointed out to the plaintiff bank, it restored the funds to the partnership account in which the defendant had an interest. The court concluded that the marking of "paid in full" was a mistake, as the money had been taken out of the wrong account. The cancellation of the negotiable instrument thus had no effect and was unintentional, as it was made by mistake. The bank "would not have surrendered the note if it did not, in good faith, believe it had, in fact, been paid." *Id.* at 380, 494 A.2d at 1219. If the bank is somehow arguing a lack of consideration as the basis for the alleged mistake, its position is clearly untenable, as § 3-605 covers failure of consideration.

Other courts have ruled that whether a court chooses to consider the stamping of a note "paid" as a cancellation of the instrument under § 3-605(1)(a) or as a renunciation of rights under § 3-605(1)(b), the discharge must be made intentionally and not as a result of mistake. See, *Gibraltar Sav. Ass'n v. Watson*, 624 S.W.2d 650 (Tex. App. 1981) (clerical error); *First Galesburg Nat'l Bk. & Tr. v. Martin*, 58 Ill. App. 3d 113, 373 N.E.2d 1075 (1978) (note was marked "paid" and returned to defendants through a clerical error—writing off defendants' account as a bad debt as a matter of internal accounting procedure). A clerical error should be contrasted to the actions of a bank president and vice president. Further, *Dowling* may be contrasted in that the bank there immediately returned the funds to the account.

Rather, surrender of the notes canceled the obligations. Additional authority for this proposition is found in the case of *Peterson v. Crown Financial Corp.*, 661 F.2d 287 (3d Cir. 1981). At the district court level, it was resolved that an original note that was canceled and returned to Peterson was discharged although the renewal note failed to incorporate interest on the original note. The court of appeals for the third circuit agreed,

finding the reasoning of the district court persuasive, that
> parties such as Crown, which deal regularly in negotiable instruments, "ought to be held, as a matter of law, to an understanding of the implications which normal business practice assigns to 'intentionally cancelling [an] instrument' . . . ." 476 F.Supp. at 1159. The court thus held that subjective intent not to discharge was irrelevant; mere intent to cancel was sufficient.

661 F.2d at 290.

The court of appeals focused on the relationship between an instrument and the debt it represents under both common-law principles and the U.C.C.:
> "[A] negotiable instrument is regarded as the debt itself. This conception is due, in part, to the similarity, in form and function, of commercial paper to that of government currencies and bank notes. The unitary concept of a debt fused into the written evidence of it, leads readily to the further concept that destruction of the physical res itself by its owner destroys the legal relations which it induces. Consideration is thus not necessary. Cancellation then becomes a sort of constructive tearing up of the instrument."

661 F.2d at 290.

The result that the notes are discharged is consistent with the precode case decided in Nebraska of *In re Estate of Mathews*, 134 Neb. 607, 279 N.W. 301 (1938). The record showed that five notes returned to the president and owner of a corporation were marked "paid." "This indicates an intent on the part of the bank to treat the obligations represented by the notes as satisfied." *Id.* at 611, 279 N.W. at 303. The liability of all the parties to the negotiable instrument was extinguished as a matter of law. There was no claim of fraud or mistake.

The normal scenario remains that stamping the notes "paid" and delivering them to the defendant are sufficient to discharge the notes. "Statutory law makes cancellation or holding by the principal debtor after maturity a discharge of the instrument." *Bryant v. Bowles*, 108 N.H. 315, 318, 234 A.2d 534, 536 (1967). There is a strong presumption that a written instrument correctly expresses the intention of the parties to it. *Ridenour v.*

*Farm Bureau Ins. Co.*, 221 Neb. 353, 377 N.W.2d 101 (1985). The bank's officers were experienced in the banking business and certainly must have known the effects of issuing paid notes.

Even viewing the evidence most favorably to the bank, as this matter was disposed of on summary judgment, we hold that the promissory notes have been discharged as a matter of law. The personal guaranties are also thus discharged.

## REFORMATION

In its amended third-party petition against P & P, the bank sought reformation of the notes to delete the reference to the instruments being paid because it would not have intended to pay the notes had it realized that it would be required to pay moneys to the consignors. The brief in cases Nos. 86-353 and 86-354 alleges a mutual mistake on the part of the bank and P & P and/or fraud or inequitable conduct on the part of P & P. This would make any discharge ineffective.

In this jurisdiction, reformation may be decreed where there has been a mutual mistake or where there has been a unilateral mistake caused by the fraud or inequitable conduct of the other party. *Ridenour v. Farm Bureau Ins. Co., supra.* The mistake must be proven by clear and convincing evidence. *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986).

The district court found that any mistake would have been a mistake on the part of the bank and not a mutual mistake. The bank argues that a factual issue existed as to the question of mistake by the bank when it marked the notes paid. Although this may be true, a mutual mistake is required for reformation, and there was no factual question as to a mistake by P & P.

Suhr stated in his deposition of November 5, 1984, as follows:

Q. Okay. Let me ask you, as a matter of course, did you release or — excuse me. Was the indebtedness from Parks and Parks Auction Sales Managers, Inc. totally retired as a result of the payments transferred on September 19th? Were they paid in full?

A. Yes.

The deposition continued:

Q. As a result of the payments which you authorized on the 19th of September from 365510 to the loan accounts,

did you issue paid notes and release of security and mortgage agreements?

A. I issued paid notes.

On redirect examination, Suhr testified that even if someone had requested that the bank return the setoff funds to the P & P account, he would not have returned them. No demand to restore the funds was ever made or complied with. Cf. *Guaranty Bank & Trust Co. v. Dowling*, 4 Conn. App. 376, 494 A.2d 1216 (1985).

The above dialogue indicates that there was no mistake in taking the setoff and that the bank clearly intended to release the notes. P & P was obviously not operating under a mistaken belief.

A mutual mistake is a belief shared by the parties, which is not in accord with the facts. See Restatement (Second) of Contracts § 151 (1981). A mutual mistake is one common to both parties in reference to the instrument to be reformed, each party laboring under the same misconception about their instrument. *Kear v. Hausmann*, 152 Neb. 512, 41 N.W.2d 850 (1950). "A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties." *Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.*, 84 N.M. 524, 530, 505 P.2d 867, 873 (1972).

*Newton v. Brown, supra* at 613, 386 N.W.2d at 430. The facts at hand are not in line with the traditional setting of mutual mistake for purposes of reformation.

In the bank's favor is the testimony of Ingram that he did not know that moneys were usually paid out within 20 days of a deposit of auction proceeds. He was not familiar with a trust account. At present, he felt that the transaction of paying the notes should not have been run through; it should have been reversed out.

If only a unilateral mistake existed, the bank must show that P & P perpetrated fraud upon it. With respect to fraud, Suhr's testimony was as follows:

Q. And do you contend that there was any fraud

practiced by Parks & Parks Auction Sales Managers, Inc. at any time in borrowing money from Gretna State Bank?

A. No.

Q. Do you contend that Charles Parks or Patricia Ann Parks practiced any fraud at any time on the bank in connection with any amounts borrowed by Parks & Parks Auction Sales Managers, Inc.?

A. No.

The district court found no inequitable conduct on the part of P & P. The record does not produce a firm belief or conviction that there was a unilateral mistake by the bank caused by the fraud or inequitable conduct of P & P.

## SUBROGATION

Subrogation has been defined as follows:

"The substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities. * * * The lawful substitution of a third party in place of a party having a claim against another party."

*State Auto. & Cas. Underwriters v. Farmers Ins. Exchange*, 204 Neb. 414, 416, 282 N.W.2d 601, 603 (1979) (quoting Black's Law Dictionary 1279 (5th ed. 1979)). Stated differently, " 'Subrogation is *the right of one, who has paid an obligation which another should have paid, to be indemnified by the other.'* " (Emphasis supplied.) 204 Neb. at 417, 282 N.W.2d at 603 (quoting *Olin Corp. v. Work. Comp. Appeal Bd.*, 14 Pa. Commw. 603, 324 A.2d 813 (1974)).

If applied to the facts, this would mean that the bank would be subrogated to the consignors' claims against P & P, especially to avoid the unjust enrichment of P & P.

More specifically, the doctrine of equitable subrogation has been explained in *Rawson v. City of Omaha*, 212 Neb. 159, 164, 322 N.W.2d 381, 384 (1982).

" 'The doctrine of subrogation includes every instance in which one person pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made under compulsion or for the

protection of some interest of the one making the payment and in discharge of an existing liability.' . . ."

In *Rawson*, the plaintiff sought reimbursement of money from the defendant under the doctrine of *contribution* for amounts she had paid to settle claims arising out of an automobile accident. She contended that the negligence of the city was a proximate cause of the accident, and as a joint tort-feasor, the city should contribute to the amount she had paid in settlement. A separate indemnity claim was dismissed. We reversed the judgment of the district court and ruled that the plaintiff was entitled to seek reimbursement under the doctrine of equitable subrogation.

We prefaced that opinion, however, with the following:

While we believe the trial court was correct in its conclusion that, generally, in order for a party to recover contribution after a settlement of a claim by one of the parties, there must be a *common liability* proved to exist between both the party settling the claim and the party from whom contribution is being sought . . . ."

(Emphasis supplied.) 212 Neb. at 163, 322 N.W.2d at 384. The district court in the present case recognized this language and dismissed the third-party petition for the reason that no common liability existed between the bank and P & P for conversion. The court found that the consignors could have shown consequential damages in connection with the bank's conversion of auction proceeds. They would not have been entitled to show these against P & P. P & P asserts that it was not a party to the bank's conversion.

Subrogation is broad enough to include every instance in which one party pays a debt for which another party is primarily answerable.

We have stated:

"* * * [W]here one having an interest in property pays off an encumbrance on the property in order to protect his interest, he is ordinarily entitled to be subrogated to the rights and remedies of the person paid, provided the debt secured by the encumbrance is not one for which the payor is primarily liable, and the grant of such relief is equitable."

*Jones v. Rhodes,* 162 Neb. 169, 172, 75 N.W.2d 616, 618 (1956), quoting 83 C.J.S. *Subrogation* § 31 (1953).

Equitable subrogation should thus not be allowed, as the bank was itself "primarily liable" for the debt it paid. It may be said that the bank and the bank alone was liable for conversion of trust funds. It simply paid its own debt and is not to be subrogated to anyone's rights. See *Luikart v. Buck,* 131 Neb. 866, 270 N.W. 495 (1936). The district court found that the amount converted equaled an amount identical to the amount of the two promissory notes plus interest.

The principle of subrogation is applied to subserve the ends of justice and to do equity in the particular case under consideration. *Rawson, supra.* There is no general rule which will afford a test for its application; rather, the facts and circumstances of each case will determine whether the doctrine is applicable. *Id.* The doctrine is not applicable to the present facts.

TIMELY FILING AGAINST AN ESTATE

Claims against the estate of a decedent which are based on promissory notes executed by the deceased must be presented within the time provided by Neb. Rev. Stat. § 30-2485(a)(1) (Reissue 1985) and in the manner provided in Neb. Rev. Stat. § 30-2486 (Reissue 1985), if notice to creditors has been published. Section 30-2485(a) provides as follows:

(a) All claims against a decedent's estate which arose before the death of the decedent, including claims of the state and any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort, or other legal basis, if not barred earlier by other statute of limitations, are barred against the estate, the personal representative, and the heirs and devisees of the decedent, unless presented as follows:

(1) within two months after the date of the first publication of notice to creditors if notice is given in compliance with section 30-2483; *Provided,* claims barred by the nonclaim statute at the decedent's domicile before the first publication for claims in this state are also barred in this state. If any creditor has a claim against a decedent's

estate which arose before the death of the decedent and which was not presented within the time allowed by this subdivision, including any creditor who did not receive notice, such creditor may apply to the court within sixty days after the expiration date provided in this subdivision for additional time and the court, upon good cause shown, may allow further time not to exceed thirty days;

(2) within three years after the decedent's death, if notice to creditors has not been published.

In case No. 87-113, the district court found that the bank's claim against the estate of Charlie Parks on the promissory notes was not timely filed as required by § 30-2485. Notice to creditors was published on February 20, 1985, and the bank had failed to file a claim or suit on the promissory notes within 2 months of that time, according to the order of the district court.

The bank filed claims on April 22, 1985, totaling $597,653.49, one of which specifically described the claim as for: "Claims asserted against Gretna State Bank by The Waggoners Trucking and J. J. Schaeffer [sic] Livestock Hauling, Inc., in the District Court of Sarpy County, Nebraska for which Charles Lee Parks, deceased, may be liable to Gretna State Bank."

The question here appears to turn on when the bank's claim, if any, arose against the estate. The bank argues that its claim did not arise upon Charlie's death but, rather, on January 20, 1986, when the settlement with the consignors occurred. The bank asserts that it had 4 months from this date to present its claim, which it met by filing suit in case No. 87-113 on April 8, 1986. See § 30-2485(b)(2). This date, however, is nearly 1 year after the time limits provided in § 30-2485(a).

Section 30-2485(b)(2) provides:

(b) All claims, other than for administration expenses, against a decedent's estate which arise at or after the death of the decedent, including claims of the state and any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort, or other legal basis, are barred against the estate, the personal representative, and the heirs and devisees of the decedent, unless presented as

follows:

. . . .

(2) any other claim, within four months after it arises.

The bank was sued by the consignors on October 15, 1984, approximately 1 month after Charlie's death. Although the bank did not know it would have to pay the consignors at that time, it was certainly aware of the possibility and should have taken the precaution of filing a claim against the estate of Charlie Parks. This notice was within the period for the bank to have aptly met the statutory requirement of § 30-2485(a)(1).

In *In re Estate of Feuerhelm*, 215 Neb. 872, 341 N.W.2d 342 (1983), we explained the purpose of the nonclaim statute, § 30-2485, as

facilitation and expedition of proceedings for distribution of a decedent's estate, including an early appraisal of the respective rights of interested persons and prompt settlement of demands against the estate. As a result of the nonclaim statute, the probate court or the personal representative can readily ascertain the nature and extent of the decedent's debts, determine whether any sale of property is necessary to satisfy a decedent's debts, and project a probable time at which the decedent's estate will be ready for distribution.

215 Neb. at 874-75, 341 N.W.2d at 344.

Even assuming the district court's position, the bank argues that the purpose of the nonclaim statute has been fulfilled. It notes that motions to file third-party petitions against the estate were filed on January 29, 1985, and the petitions filed on February 22, 1985, giving the personal representative sufficient notice and time to satisfy the decedent's debts.

In the alternative, the bank sets forth § 30-2486 as allowing a claim via commencement of a proceeding against the personal representative. This section provides for presenting claims against a decedent's estate as follows:

(2) The claimant may commence a proceeding against the personal representative in any court which has subject matter jurisdiction and the personal representative may be subjected to jurisdiction, to obtain payment of his or her claim against the estate, but the commencement of the

proceeding must occur within the time limited for presenting the claim. No presentation of claim is required in regard to matters claimed in proceedings against the decedent which were pending at the time of his or her death.

This provision refers back to § 30-2485.

The bank is barred from pursuing a claim against the estate. *Feuerhelm* clarifies this point. In *Feuerhelm*, the issue was whether to allow a claim on a promissory note executed by the decedent. We did not accord notice the stature of a claim, in stating, "Mere notice to a representative of an estate regarding a possible demand or claim against an estate does not constitute presenting or filing a claim under § 30-2486." 215 Neb. at 875, 341 N.W.2d at 345. We affirmed the decision of the trial court disallowing the claim.

We find that the bank was "primarily liable" on the debt it paid and should not be subrogated to the rights of the consignors. No mutual mistake or fraud existed for purposes of reformation. The other theories of recovery are without merit. The judgment of the district court is affirmed.

AFFIRMED.