MICHAEL McCORMACK, APPELLANT, V. FIRST WESTROADS BANK,
A CORPORATION, APPELLEE.

473 N.W.2d 102

Filed August 16, 1991.   No. 89-002.

James P. Fitzgerald, of McGrath, North, Mullin & Kratz, P.C., for appellant.

Thomas F. Flaherty, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

Plaintiff-appellant, Michael McCormack, signed a pledge agreement guaranteeing a debt of Acoustical Engineering, Inc., and pledging certain shares of stock as collateral. After Acoustical defaulted on its promissory note to defendant-appellee, First Westroads Bank (hereinafter Bank), the Bank sold the stock and applied the proceeds to the debt. In his second amended petition, McCormack set out four "causes of action," alleging generally that the Bank converted the pledged shares of stock, as shown by certain alleged conduct of the Bank. The district court for Douglas County granted summary judgment in favor of the Bank and dismissed McCormack's petition.

McCormack appeals from that order, assigning as error the actions of the trial court "in entering summary judgment for the [Bank] because there were genuine issues of material fact and the evidence was susceptible of different interpretations." McCormack then assigns as error the actions of the court in seven specific instances: (1) in determining that the evidence was not sufficient to show that a later promissory note between Acoustical and the Bank did not discharge Acoustical's prior indebtedness secured by McCormack's pledge of collateral, or that there was not a material fact issue as to a conversion; (2) in determining that the refinancing of the earlier note was an extension of the underlying debt that McCormack had agreed to; (3) in determining that the Bank acted in good faith; (4) in finding that the Bank's promise to set up a "lock box" agreement to collect Acoustical's receivables was not enforceable by McCormack; (5) in failing to find that "the Bank's disclaimer of its duty to protect and preserve the collateral was unenforceable"; (6) in failing to resolve the issue "whether the Bank's disposition of Acoustical's assets was commercially reasonable"; and (7) in dismissing the case without ruling on McCormack's contention that the Bank had

improperly applied Acoustical's collateral to debts other than the debt guaranteed by McCormack. We affirm.

A summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences to be drawn therefrom and that the moving party is entitled to judgment as a matter of law. Neb. Rev. Stat. § 25-1332 (Reissue 1989); *Millard v. Hyplains Dressed Beef*, 237 Neb. 907, 468 N.W.2d 124 (1991). In a court's consideration of a motion for summary judgment, the evidence is to be viewed most favorably to the party against whom the motion is directed, giving to that party the benefit of all favorable inferences which may reasonably be drawn from the evidence. *J. J. Schaefer Livestock Hauling v. Gretna St. Bank*, 229 Neb. 580, 428 N.W.2d 185 (1988). Since the party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists, that party must produce enough evidence to demonstrate his entitlement to a judgment if the evidence were to remain uncontroverted at a trial, after which the burden of producing contrary evidence shifts to the party opposing the motion. *Deutsche Credit Corp. v. Hi-Bo Farms, Inc.*, 224 Neb. 463, 398 N.W.2d 693 (1987).

In this appeal, we must view the evidence in a light most favorable to McCormack and give him the benefit of all reasonable inferences deducible from the evidence. See *Millard v. Hyplains Dressed Beef, supra*.

The record presents the following facts in the form of affidavits, depositions, and exhibits: Acoustical was incorporated in 1963 by McCormack, acting as its attorney. Gerald Carlson and Darlene Carlson, husband and wife, were the sole stockholders of Acoustical and were two of the three directors of the company. McCormack was the other director. McCormack continued to serve as Acoustical's primary attorney until sometime after Acoustical ceased active business operations on December 31, 1986.

Acoustical and the Bank had a banking relationship which predated 1981. In 1981, Acoustical was involved in a construction contract in Saudi Arabia. Under that contract, Acoustical was obligated to provide a performance bank

guaranty in the sum of 545,287.50 Saudi riyals (approximately $168,000). Acoustical requested the assistance of the Bank in the issuance of this performance guaranty. The Bank required as a condition to the issuance of the performance guaranty that Acoustical provide negotiable collateral of a value of $180,000. Acoustical was not financially able to provide the collateral.

McCormack, as trustee for himself; his father, John McCormack; and Michael Hagge, agreed with Acoustical to provide the $180,000 of collateral to support the performance guaranty in exchange for a fee of $150,000. McCormack, his father, and Hagge pledged various municipal bonds owned by McCormack's father and a $65,000 Bank of Millard certificate of deposit owned by Hagge to the Bank to collateralize the Acoustical performance guaranty. None of the pledged collateral was owned by McCormack.

The date for Acoustical's payment of the $150,000 fee to McCormack under the Acoustical-McCormack agreement came and went, and Acoustical was unable to pay it. In the meantime, under the Saudi Arabian contract, Acoustical was obligated to replace the previously issued performance guaranty with a maintenance guaranty in approximately the same dollar amount. On or about March 21, 1983, the maintenance guaranty was issued by the Bank. The Bank at that time was still in possession of the collateral provided to it by McCormack in connection with the previously issued performance guaranty.

In early July 1983, McCormack met with Gerald Carlson, Acoustical's president, to discuss how Acoustical could collateralize the new maintenance guaranty in order that McCormack's group's collateral could be released and at the same time pay McCormack his $150,000 fee. They agreed that Acoustical should pay the $150,000 fee to McCormack and that McCormack would buy a $150,000 certificate of deposit and pledge it as collateral for the maintenance guaranty. The collateral owned by the others would be released.

This agreement was carried out. McCormack bought a $150,000 certificate of deposit with the $150,000 paid to him by Acoustical and pledged it to the Bank to collateralize the maintenance guaranty. The collateral owned by McCormack's

father and Hagge was released and returned to them.

Peter Zandbergen, a vice president of the Bank, prepared an assignment of money market certificate and sent it to McCormack. McCormack did not like the form, and he redrafted it and signed it. Under this agreement, McCormack pledged the $150,000 certificate of deposit purchased with the $150,000 paid to him by Acoustical to the Bank as collateral for the guaranty.

In January 1984, the existing $150,000 certificate of deposit matured, and McCormack purchased three certificates of deposit of the Bank totaling $150,000 and pledged them to the Bank as the collateral for the maintenance guaranty.

On May 21, 1984, Acoustical secured a $300,000 loan through the Small Business Administration (SBA) guaranteed loan program. The SBA guaranteed the Bank repayment of 80 percent of the loan and required as collateral a first priority security interest in all of Acoustical's equipment, inventory, and accounts, subject to a $100,000 subordination in favor of the Bank with respect to Acoustical's inventory and accounts receivable. The SBA also required a lien on the Carlsons' personal residence.

On March 1, 1985, McCormack advised the bank that he wanted to use some of the money represented by the pledged certificates of deposit to invest in 2,000 shares of First Data Resources, Inc., stock and to substitute the First Data Resources stock as collateral. The Bank agreed to this substitution. By assignment of stock dated May 6, 1985, McCormack pledged the 2,000 shares of First Data Resources stock to the Bank as collateral for the existing maintenance guaranty.

In June 1985, McCormack purchased an additional 1,500 shares of First Data Resources stock. He requested the Bank to cash some of the pledged certificates of deposit to pay the $41,337.72 price and instructed his broker to forward the stock to the Bank. The Bank complied with his request.

By a third-party pledge agreement dated September 1985, McCormack pledged the 3,500 shares of First Data Resources stock and two certificates of deposit as collateral for Acoustical's obligations under the maintenance guaranty. On

October 21, 1985, the beneficiary of the guaranty drew on it, and the banks involved were obligated to fund the draw.

Also on October 21, 1985, Acoustical signed a new promissory note to the Bank in the sum of $160,009, representing the $153,786.54 paid out on the guaranty and an estimate of the amount of legal fees and expenses incurred in connection with a lawsuit involving that transaction. Acoustical signed a security agreement in favor of the Bank under which it pledged two certificates of deposit totaling $35,000. McCormack authorized and directed his stockbroker to dispose of the First Data Resources stock and purchase as many shares of Berkshire Hathaway stock as could be purchased with the proceeds, and directed his broker to deliver the Berkshire Hathaway stock certificates to the Bank. McCormack signed a third-party pledge agreement under which he pledged the two certificates of deposit then still being held by the Bank and the Berkshire Hathaway stock as collateral for the new October 21, 1985, Acoustical $160,009 promissory note.

Acoustical's October 21, 1985, $160,009 note matured in 1986, and another Acoustical note, representing advances made for general working capital, with an outstanding balance of $63,135.61, matured on April 26, 1986. By a promissory note dated June 20, 1986, the outstanding balances of both of these notes were combined into one $228,647.90 note from Acoustical to the Bank.

By a third-party pledge agreement dated July 11, 1986, which was identical to the other third-party pledge agreements that McCormack had previously signed in favor of the Bank, McCormack reaffirmed the pledge of the 52 shares of Berkshire Hathaway stock, which were then being held by the Bank as security for Acoustical's earlier notes and as security for the June 20, 1986, note and all extensions and renewals of it. The pledge agreement is the subject of this action. This pledge agreement stated it was executed

> [t]o secure . . . the debt liability or obligation of Acoustical Engineering, Inc. ("Debtor") to Secured Party [the Bank] evidenced by or arising under the following: March 14, 1983 Letter of Credit Agreement, September 15, 1985,

Reaffirmation & Indemnity Agreement, October 21, 1985, $160,009.00 Promissory Note June 20, 1986 $228,647.90 Promissory Note and *any extensions, renewals or replacements thereof . . . .*

(Emphasis supplied.)

On July 11, 1986, Acoustical signed a "Lock Box Processing Agreement," under which the Bank agreed to provide a post office box for Acoustical's remittances, to process the items remitted to the post office box, and to deposit the proceeds in Acoustical's checking account. This agreement did not require the Bank to collect Acoustical's accounts receivable and apply any part of the collections to Acoustical's obligations at the Bank.

By November 19, 1986, Acoustical thought it had an agreement with outside investors under which the investors would provide a $1,500,000 line of credit to pay off the Bank debt and provide working capital in exchange for 50 percent of the Acoustical stock. By this time, two of Acoustical's notes had matured. An October 10, 1985, note for $117,085.55 was due and payable on October 31, 1986, and the June 20, 1986, note for $228,647.90 was due and payable on November 10, 1986. Evidence showed that because it appeared that Acoustical's outside investor plans were nearing consummation, the Bank decided to renew both notes.

By letter to Acoustical dated November 28, 1986, the Bank enclosed "two loan renewals" and requested that they be signed and returned. One of the renewal notes, in the sum of $237,095.62, evidenced the renewal of the unpaid balance of the June 20, 1986, $228,647.90 note plus accrued interest. Both notes were signed by Acoustical and returned to the Bank.

By December 31, 1986, Acoustical learned that the investors had withdrawn their investment offer. Acoustical immediately discontinued its business operations.

On March 18, 1987, pursuant to the terms of the SBA loan guaranty agreement, the Bank assigned, transferred, and endorsed all of its rights and interests in the Acoustical May 21, 1984, $300,000 promissory note and in all of the collateral documents and guaranties to the SBA. Thereafter, the SBA conducted all phases of the sale and disposition of Acoustical's

assets except for the collection of Acoustical's accounts receivable.

On March 25, 1987, after appropriate written notification, the Bank sold McCormack's Berkshire Hathaway stock at a private sale for the total sum of $183,040. No one attended the sale except the Bank's representatives. The Bank was the buyer and tendered the stock certificates to Dain Bosworth, Inc., for registration in the Bank's name.

All of the remaining Acoustical assets, including all inventory, equipment, machinery, etc., were sold by the SBA, and the proceeds thereof were applied to the unpaid balance of the May 21, 1984, $300,000 note.

Notices of the sales of the Acoustical assets were sent to McCormack by the SBA, and McCormack corresponded with the SBA concerning such sales.

After a hearing on the Bank's motion for summary judgment, the district court granted the motion and dismissed the case. In doing so, the district court found that there had not been a novation of the June 20, 1986, note and that it had not been materially modified by the November 26, 1986, note; that the Bank had not breached any duty of good faith and fair dealing to McCormack; that the Bank disposed of McCormack's collateral in a commercially reasonable manner, and as to any other collateral securing Acoustical's debts, the manner in which it was disposed of had no relevance to McCormack's pledge because under the third-party pledge agreement, the Bank had no obligation to resort to any other collateral pledged by Acoustical; and that although there was evidence that employees of the Bank promised McCormack that the Bank would set up a lock box in order to collect Acoustical's accounts receivable and apply a percentage of those to reduce Acoustical's debts, this promise was in conflict with express written provisions in the third-party pledge agreement between McCormack and the Bank and was therefore ineffective.

McCormack first contends that he is not responsible under the third-party pledge agreement because the November 26, 1986, note that Acoustical signed was a novation of the June 20, 1986, note which is referred to in the July 11, 1986,

McCormack pledge agreement. In support of this argument, McCormack relies on testimony by the Carlsons that they thought the November 26, 1986, note was a new note; his allegation that the Bank approached him in November 1986 to sign a new pledge agreement; evidence of some bank procedures regarding trust documents on the Carlsons' residence; computer reports of the Bank that show the June 20, 1986, obligation as "paid"; and the fact that the amount of the obligation increased and the rate of interest decreased.

The July 11, 1986, third-party pledge agreement provided that McCormack pledged 52 shares of Berkshire Hathaway stock to secure the debt of Acoustical arising under various notes set out above "and any extensions, renewals or replacements thereof." The agreement also provides in paragraph 6, captioned "Waivers by Pledgor":

> Pledgor waives notice of Secured Party's acceptance hereof and notice of the creation, existence and payment or nonpayment of the Obligations. None of the following acts or things (which Secured Party is authorized to do or not to do with or without notice to Pledgor) shall in any way affect or impair the Security Interest or Pledgor's liabilities and obligations hereunder: (a) any extension or renewal (whether or not for longer than the original period) of any or all of the Obligations; (b) any change in the terms of payment or other terms of any or all of the obligations or any Collateral therefor, or any substitution or exchange of any evidence of any or all of the Obligations or collateral therefor, or any release of any collateral for any or all of the obligations; (c) any waiver or forbearance granted to Debtor or any other person liable with respect to any or all of the obligations or any release of, compromise with, or failure to assert rights against Debtor or any such other person; (d) the procurement or failure to procure any other collateral for or guarantors or sureties of any or all of the Obligations; (e) the transfer to any person, at any time, of any interest in any of the obligations or any collateral therefor; (f) any arrangement, composition, extension, moratoria or other relief granted to Debtor pursuant to any statute now in

force or hereafter enacted; (g) any interruption in business relations between Secured Party and Debtor; (h) the failure or neglect to protect or preserve any Obligation or any collateral therefor, or to exercise any right which may be available to Secured Party by law or agreement prior to or after an Event of Default or a default under any other agreement, or any delay in doing any of the foregoing; (i) the failure or neglect to ascertain or assure that the proceeds of any loan to Debtor are used in any particular manner; and (j) the application or failure to apply in any particular manner any payments or credits upon the Obligations.

On November 26, 1986, Gerald and Darlene Carlson executed another promissory note to the Bank. McCormack contends that this note was a new note and, therefore, constitutes a novation. The Bank contends the note was merely a renewal of an existing obligation. Gerald and Darlene Carlson both testified that they thought the note was a new note. Neither testified that they had a specific agreement with the Bank that their prior obligations with the Bank were extinguished. Darlene Carlson testified that she knew Acoustical remained responsible for the debt under the June 20, 1986, note.

McCormack claims that the Bank requested him to sign a new third-party pledge agreement and that he refused because nothing had been paid on the obligation secured by his stock. There is nothing in the evidence to support this assertion other than his statement and Gerald Carlson's stated belief that the Bank approached McCormack about a new pledge agreement. Zandbergen testified that McCormack was not asked to sign a new pledge agreement because under the terms of the July 11, 1986, document, McCormack's pledge was good for any renewals or extensions of Acoustical's obligations.

Documentary evidence on this point is conclusive. As reflected in the affidavit of Robert Anderson, the Bank's president, the computer report McCormack points to is a report used internally by the Bank to show a loan history. The computer software which generated the report cannot distinguish between the payment of a note by renewal or the

payment of a note. In each instance of actual payment or renewal, the computer report shows the transaction as a "payoff."

The entries on the reverse side of the June 20, 1986, note have the same bookkeeping implications. As reflected in Anderson's affidavit, these are the customary entries made by Bank personnel to reflect either a renewal or an actual payment. The physical disposition of the original of the note and what is placed on the front side are the true indicators of what occurred. If the note is actually paid, the front is stamped "paid" and the original note is delivered to the borrower. If the note is renewed, it is stamped "renewed" and the Bank keeps the original.

As to the procedures regarding trust documents on the Carlsons' residence, the Bank's policy was to provide all of the real estate titleholders notice of right of rescission whenever residential real estate is taken as collateral and any of the makers of the promissory note own an interest in the real estate. The Bank had advised its personnel that they are not to attempt to make a determination of whether a federal regulation requiring this procedure is technically applicable or not to the transaction. This procedure is to be followed whether the loan is a new loan or the renewal of an existing loan.

The increase in the amount of the obligation under the November 26, 1986, note is due to unpaid interest that had accrued. The change in the interest rate was because of an extended period for repayment. The Bank was authorized to make these changes without any effect on its agreement with McCormack, according to paragraph 6 of the July 11, 1986, pledge agreement.

The evidence regarding the November 26, 1986, note is clear that it was a renewal note. The note is identified as a renewal of the June 20, 1986, note and was retained by the Bank. The note was not marked "paid" and was not returned to Acoustical. The obligation under the June 20, 1986, note was never paid.

" 'The taking of a new note for an existing note is a renewal of the old indebtedness, and not a payment of the debt, unless there is a specific agreement between the parties that the new note shall extinguish the original debt.' " *First West Side Bank*

*v. Herzog*, 204 Neb. 356, 360-61, 282 N.W.2d 38, 41 (1979). There is nothing in the evidence to establish that the parties had a specific agreement to extinguish the debt under the June 20, 1986, note. McCormack's evidence fails to controvert the fact that the November 26, 1986, note was a renewal of the June 20, 1986, note. The third-party pledge agreement that he signed provided that McCormack was liable for the amount of the June 20, 1986, note and all renewals and extensions thereof. "[T]here is a strong presumption that a written instrument correctly expresses the intention of the parties to it. . . . [P]arties are bound by the terms of the contract even though their intent may be different from that expressed in the agreement." *Bedrosky v. Hiner*, 230 Neb. 200, 205, 430 N.W.2d 535, 539 (1988).

The trial court did not err in its determination that there was no material fact question before it as to the fact that McCormack's pledge agreement was applicable to the Acoustical November 26, 1986, note.

McCormack then contends that even if there was not a novation of the June 20, 1986, note, the November 26, 1986, note is a material modification of the prior obligation because he did not consent to the increase in the obligation. As stated above, the increase is due to interest. There is nothing in the evidence to suggest the November 26, 1986, note materially modified the terms of the June 20, 1986, note. Nothing changed except the amount of the obligation and some payment terms and interest. All of this was authorized under paragraph 6 of the July 11, 1986, third-party pledge agreement signed by McCormack. The trial court did not err in its determination in this regard.

McCormack then contends that the Bank breached a duty of good faith and fair dealing to him because it failed to adequately disclose adverse financial information concerning Acoustical to him. While the Bank might have suspected that Acoustical was going to be unable to repay its obligations to it, there was also evidence to indicate that Acoustical's situation was improving. Furthermore, McCormack never asked the Bank about Acoustical's ability to pay.

Where the surety makes no inquiry on the subject, the

duty of disclosure as to facts increasing the risks of the undertaking depends upon the circumstances of the case. Generally, the creditor may assume that the surety has obtained information from other sources or has chosen to assume whatever risks may be involved. A duty of disclosure may arise when the creditor knows or has good grounds for believing (1) the surety is being deceived or misled or (2) the surety has been induced to enter the contract in ignorance of facts materially increasing his risks, of which the creditor has knowledge and the opportunity to disclose prior to the surety's acceptance of the undertaking.

*Bock v. Bank of Bellevue*, 230 Neb. 908, 917, 434 N.W.2d 310, 316 (1989).

There is nothing in the evidence to suggest that McCormack was deceived or misled or that he had been induced to enter the third-party pledge in ignorance of facts materially increasing his risks. He was Acoustical's attorney and heavily involved in negotiating the guaranty from the beginning. If he never saw any of Acoustical's financial information, it was not because of any lack of access to it. The trial court did not err in this connection.

McCormack then claims that the Bank should have applied $35,000 of Acoustical-owned certificates of deposit proceeds to the Acoustical debt secured by his stock. The basis for this claim is the Carlsons' testimony that they pledged those certificates of deposit to help reduce McCormack's liability under the third-party pledge agreement and their understanding that when the Bank cashed the certificates, the proceeds would reduce the loan that McCormack's pledge secured.

The October 21, 1985, security agreement between Acoustical and the Bank provides that the certificates of deposit are pledged as security for all debts owed by the debtor to the secured party, that the secured party may apply collateral proceeds to the payment of obligations in such order of application as the secured party may determine, and that the secured party is not obligated to apply cash proceeds of collateral in any particular order of application.

McCormack, under the express terms of paragraph 6(j) of

the pledge agreement, acknowledged that the application or failure to apply in any particular manner payments or credits upon the obligations would have no effect on his liability under the pledge agreement. He may not be heard to contend to the contrary now.

Collateral proceeds are to be applied in the manner provided in the agreement between the parties or, in the absence of such agreement, in such order as the creditor determines. *First Nat. Bank v. Benedict Consol. Indus.*, 224 Neb. 860, 402 N.W.2d 259 (1987). The Bank's application of Acoustical's certificates of deposit proceeds to debt not secured by McCormack's pledge was not a breach of a duty of good faith, and McCormack's claim in this regard is without merit.

McCormack then asserts that the Bank disposed of Acoustical's collateral in a commercially unreasonable manner. The evidence regarding this issue is Carlson's testimony as to the value of Acoustical's equipment and inventory and what was offered for it prior to the SBA's taking over the loan and disposing of the collateral.

Paragraph 7 of the July 11, 1986, third-party pledge agreement signed by McCormack provides:

> Whether or not Pledgor requests or demands that Secured Party do so, Secured Party shall not be required before exercising and enforcing its rights under this Agreement first to resort for payment of the Obligations to Debtor or to any guarantor or surety or other person obligated with respect to any Obligation, or to their properties or estates, or to any security interest or other collateral securing payment of any or all of the Obligations, or to any other interests, properties, liens, rights or remedies whatsoever. Pledgor agrees to defer exercising, and hereby waives, any and all rights which Pledgor might otherwise have to obtain reimbursement or payment from Debtor or other persons obligated with respect to any or all of the obligations or out of the property of Debtor or of such other persons (whether such rights to obtain reimbursement or payment are rights of recourse, rights of subrogation, rights of contribution, or otherwise) until all the Obligations shall have been fully paid to Secured

Party.

There is nothing in the evidence to suggest that the Bank's disposition of the Berkshire Hathaway stock was not done in a commercially reasonable manner. As to the disposition of the other collateral securing Acoustical's obligations, all of it except the collection of the accounts receivable was turned over to the SBA, pursuant to the SBA loan authorization and guaranty agreement. McCormack was fully aware of all these transactions. The Bank did not dispose of collateral, other than the shares of stock in question. The SBA did.

Neb. U.C.C. § 9-504(5) (1980) provides as follows:

> A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this article.

After the collateral was transferred to it under the SBA loan authorization and guaranty agreement, the SBA was the "secured party" for purposes of disposing of the collateral in a commercially reasonable manner under § 9-504(5). See *Reeves v. Associates Financial Services Co., Inc.*, 197 Neb. 107, 247 N.W.2d 434 (1976).

McCormack does not contend that the Bank's collection of Acoustical's accounts receivable was done in a commercially unreasonable manner, and as to the collateral transferred to the SBA, if any commercially unreasonable disposition occurred, the SBA is the party responsible, not the Bank.

Finally, McCormack argues that the Bank breached a duty of good faith in not implementing a lock box agreement. The evidence shows that Zandbergen did represent at the time McCormack signed the July 11, 1986, third-party pledge agreement that the Bank would use the lock box to collect Acoustical's accounts receivable and apply a part of the accounts collected to reduce all of Acoustical's obligations at the Bank. The Bank did not begin doing this until sometime in November 1986.

The third-party pledge agreement signed by McCormack on July 11, 1986, states in paragraph 7 that the Bank did not have

to resort to any other collateral to satisfy the obligation. The trial court found that Zandbergen's representations on behalf of the Bank conflicted with the express terms of the pledge agreement and were therefore ineffective. "The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement." *Five Points Bank v. White*, 231 Neb. 568, 571, 437 N.W.2d 460, 462 (1989). The Bank did not violate any duty of good faith by disposing of McCormack's pledged stock, pursuant to the terms of the third-party pledge agreement. McCormack's argument is without merit.

The underlying controlling fact is the written pledge agreement. As the trial court said in its memorandum order, "It is a very ordinary pledge agreement where the pledgee [Bank] took the pains to have the pledgor [McCormack] renounce all right the law might otherwise have given him." McCormack was an experienced businessman and attorney. He voluntarily and knowingly signed a strict pledge agreement. The Bank produced enough evidence to sustain its motion for summary judgment on McCormack's suit to vary the terms of that agreement or set it aside. McCormack failed to controvert the Bank's evidence. The district court was correct in granting the Bank's motion and dismissing the case.

The judgment is affirmed.

AFFIRMED.