YORK EQUIPMENT, INC., APPELLANT, V. DENNIS ASHWILL, APPELLEE.

510 N.W.2d 79

Filed December 21, 1993. No. A-92-154.

Vincent Valentino, of Angle, Murphy, Valentino & Campbell, P.C., for appellant.

Robert B. Creager, of Berry, Anderson, Creager & Wittstruck, P.C., for appellee.

SIEVERS, Chief Judge, and HANNON and MILLER-LERMAN, Judges.

HANNON, Judge.

York Equipment, Inc., the plaintiff, commenced this action seeking to reform a retail installment sale contract that it had made with Dennis Ashwill, the defendant. Under this contract, York sold a large amount of farm machinery to Ashwill in consideration for a cash downpayment, machinery, and a cash balance payable by Ashwill in eight semiannual installments. York maintains that the balance due on the contract was incorrectly computed and that this error was a mutual mistake which should be corrected. In the alternative, York argues it should receive a judgment against Ashwill in the amount of the error on a theory of subrogation or a theory of unjust

enrichment. The case was tried to the court as an equity case, and the trial court found for Ashwill, dismissing York's petition. York appeals this decision, and we reverse the judgment and remand the cause with directions.

## APRIL 21, 1990, CONTRACT

The written contract was prepared on a printed form entitled **"J I Case Credit Corporation Retail Installment Sale Contract and Security Agreement."** In addition to the necessary information such as the name and address of the parties, warranty information, and the necessary verbiage of an installment sale contract and a security agreement, the form contains a ruled section for the listing of the several pieces of equipment being sold and the sale price of each piece. It also contains a similar but smaller area to list the description of property being traded in, the trade-in allowance, and the amount of any encumbrances on this property. In this area, the form states the "Purchaser hereby conveys to Seller the Trade-In Equipment free and clear of all encumbrances except as noted above." The form also contains the necessary lines, organized so the value of the encumbrances can be subtracted from the trade-in allowance and the net trade-in allowance shown. The form has a **"Statement of Transaction"** section where the cash sale price may be recorded in an organized fashion, the downpayment and net trade-in allowance subtracted from the cash sale price, and the difference shown as the "Unpaid Balance of Cash Sale Price." The form then has the usual spaces to compute the finance charges and to display the semiannual payments and other information required by state and federal laws for credit sales with interest.

When the contract was completed and signed on April 21, 1990, the machinery being sold and traded in was partially listed on the contract form in the spaces provided, but in the area of the form listing the machinery sold, the words "Reference to Addendums [sic] #1,2,3,4,5" appear. These addenda were also signed by the parties on the same date as the contract was signed. Addenda Nos. 1, 2, 3, and 4 list all the pieces of equipment Ashwill purchased, the serial number, and the sale price of each piece. Each addendum is then totaled, and

the totals appear in the cash-sale-price column of the installment sale contract. The total sale price, including sales tax, was $1,138,377.

Addendum No. 5 listed 21 pieces of machinery Ashwill traded in, with the serial number and the trade-in value listed for each piece. The trade-in values are totaled to $1,000,341.08, and this figure appears on the installment sale contract as the "Seller's valuation of Trade-In Equipment." Page 2 of addendum No. 5 reads in part as follows:

PAYOFF JOHN DEERE CREDIT CORP.

| | |
|---|---:|
| NOTE #08474460472RB | − $106,394.36 |
| NOTE #08474460472RC | − 152,450.05 |
| NOTE #08474460472RJ | − 143,779.15 |
| NOTE #08476366676RF | − 27,576.52 |
| NET PAYOFF AMOUNT | − $430,200.08 |
| NET TRADE ALLOWANCE | $570,141.00 |

The $430,200.08 figure was listed on the contract form underneath the space for the seller's valuation of the trade-in equipment in a space labeled "less amount owing to (encumbrances)," and the net trade-in allowance shown on the contract was $570,141.

Two of the tractors Ashwill was trading in had been subject to liens held by the John Deere Company totaling $109,379.67. Because York had paid John Deere for these liens in January 1990, these liens were not included in the total payoff figure obtained from John Deere when the contract was prepared in April. York claims that not including the amount of these liens in the amount of encumbrances listed as outstanding on the contract was a mutual mistake which justifies reformation of the contract. In the alternative, York argues the court should have granted York a judgment against Ashwill on the basis that York would be subrogated to John Deere's rights or on the basis that Ashwill was unjustly enriched by the mistake. The background necessary to judge the nature of the mistake is complex.

### DECEMBER 15, 1989, CONTRACT

In June 1989, York was a well-established truck and agricultural equipment dealership in York, Nebraska. Ashwill

was a well-established farmer and custom harvester who lived in Dassel, Minnesota. Dan Reiter was the sales supervisor for York in 1989 and 1990. In June 1989, Darwin Shriver, a salesman for York, received a telephone call from Ashwill inquiring about a trade-in for several new combines. Shriver handled the preliminary negotiations. The negotiations remained general until Reiter and Shriver went to South Dakota and Minnesota in mid-November to inspect the machinery Ashwill wanted to trade in to York for the combines. On November 30, Shriver called Ashwill and told him they needed to make the agreement firm that day in order for Ashwill to avoid an impending price increase on the new combines. The parties made an oral agreement over the telephone by which Ashwill agreed to purchase eight combines and other equipment. However, later that day, Ashwill called Reiter and ordered two more combines. No written agreement was signed until December 15.

If the sale was going to be made, York needed to order at least some of the combines for the purpose of filling Ashwill's order. York officials were anxious to get a firm, signed contract with Ashwill. Ashwill came to York, Nebraska, on December 15, and the parties negotiated and signed a contract on a form regularly used by York that was entitled **"Retail Order."** This document did not have the usual provisions of an installment sale contract and security instrument, but it contained spaces for listing the machinery sold, the machinery traded in, and the amounts owing on the traded-in machinery, as well as blank spaces organized for computing the unpaid cash balance. Insofar as information about the machinery being sold and traded in, and for what price, this form was essentially equivalent to the form used for the April 21, 1990, contract.

The December 15 contract provided for Ashwill to buy 10 new combines and associated machinery for a cash price of $1,420,590, to be paid for by a cash downpayment of $9,100 with the order, and the trading-in of several pieces of machinery valued at $1,119,115 which were subject to liens totaling $491,709. The net value of the property, $697,406, was added to the cash downpayment of $9,100, and the resulting figure of $636,506 was entered in a box entitled "Total Down Payment."

The downpayment was subtracted from the cash sale price, plus tax, to obtain the unpaid cash balance that was listed as $790,113.50. The contract did not provide the method of payment of the balance, although it did provide an annual interest rate of 14.5 percent and that the finance charges were to begin accruing September 1, 1990. The form provided for financing for a qualified buyer, and agreement by the buyer to give a security interest, in the event the balance was financed.

No addenda were attached to this contract, but the machinery sold and traded in was described on the form in an abbreviated fashion. It provided that Ashwill traded in "2-4850 MFWD" and then listed numbers corresponding to the serial numbers later listed for the tractors on addendum No. 5 of the April 21 contract. The evidence does not disclose which liens made up the total of $491,709.

When this contract was signed, York had not received delivery of the combines, and the form states: "I hereby order . . . ." The form contains space for a delivery date of the equipment being purchased, but the date was not filled in.

### ACTION UNDER THE DECEMBER 15 CONTRACT

Reiter testified that on December 15, 1989, Ashwill told York it could pick up the equipment he was trading in. The two 4850 tractors were picked up at Montevideo, Minnesota, on December 18. On January 22, 1990, York wrote John Deere a check for $109,379.67 to pay the liens on the two tractors. York claims this was done because the dealer in Minnesota upon whose property the tractors were located would not let York remove the tractors until the liens were paid. This excuse does not make sense because the tractors were removed in December, and the liens were not paid until January 22. We do not know why the liens were paid when they were, but there is no dispute that they were paid. As concluded below, why they were paid is immaterial.

Other pieces of the property Ashwill traded in were picked up by York between January 17 and March 22 from wherever they were located. Before April 21, all of the tractors and combines were picked up by York or by someone purchasing the machinery from York. Much of this equipment was resold by

York before April 21. Ashwill testified that he agreed York could pick up the machinery, but that he did not agree York could sell it.

## APRIL 21 CONTRACT IS SIGNED

Following the execution of the December 15, 1989, contract, the parties discussed possible changes in that contract and apparently negotiated over the telephone about changes in the contract. The evidence does not establish any clear modifications of the December 15 contract until April 21, 1990. On that date, Ashwill again came to York, Nebraska, and the parties negotiated and signed a second contract. Any previous modifications of the December 15 contract are immaterial because if they existed, they were likewise modified by the April 21 contract. There is no doubt that the April 21 contract superseded the December 15 contract and any possible verbal modifications the parties might have made to that contract.

Merle Lessig, York's accountant, discovered the error in June 1990 when he analyzed the transaction at the request of York's owner. When the error was discovered, York requested that Ashwill execute a new contract showing the correct value of the liens, thus increasing the amount that was unpaid on the contract by approximately $109,000. Ashwill refused, and this action followed.

## TRIAL COURT'S FINDINGS

The district court found in favor of Ashwill and dismissed this action. In its written opinion, the trial court found the contract of December 15, 1989, was prepared by York and was not based on any representations of Ashwill. It also found that Ashwill authorized York to pick up and display the machinery, but not to sell it. The court determined that York picked up the tractors on December 18 and paid the $109,379.67 on January 22, 1990, and that York sold all of the machinery except one tractor and one combine before April 21.

The court found that "Ashwill was concerned about the manipulation of the trade-in figure on the [April 21] contract by York and the numerous addenda but he was satisfied with the 'bottom line' of the contract as this was his main objective." The court further found that every entry on the April 21

contract was "verified, ascertained and entered by York's representatives." The court also found that Reiter assured Ashwill that "the figures on the final Contract were correct and he relied on the figures as presented." The court determined that it was upon this representation that Ashwill entered into the April 21 contract.

The court found that it was clear that the "time balance Ashwill expected to pay and York expected to receive on the entire transaction was $699,556.78" and that there was no evidence of a mutual mistake or of a unilateral mistake caused by the fraud or inequitable conduct of Ashwill. The court further found that York paid the liens on the tractors so that it could resell them and was a volunteer with a profit motive and that on January 22, York had no legal interest in the tractors because Ashwill still had the option of canceling the purchase order.

## ASSIGNMENTS OF ERROR

York alleges the trial court erred (1) in not finding a mutual mistake or a unilateral mistake existed with respect to the April 21 contract sufficient to require reformation of the contract; (2) in applying a clear and convincing evidentiary standard as York's burden of proof; (3) in not finding York was entitled to restitution of the $109,379 on the theories of unjust enrichment, implied contract, restitution, or subrogation; and (4) in not admitting exhibit 27 and other evidence of the loss York sustained on the sale. Since we find the parties' mistake justifies reformation of the April 21 contract, we will consider only the first and third assignments of error.

## STANDARD OF REVIEW

An action to reform a contract is an equity action, and appellate review of an equity action is by trial de novo on the record. *J. J. Schaefer Livestock Hauling v. Gretna St. Bank*, 229 Neb. 580, 428 N.W.2d 185 (1988). However, where the credible evidence is in conflict on a material issue of fact, an appellate court may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts over the other. *Id.* Regarding a question of law, an appellate court has an obligation to reach a conclusion

independent of that of the trial court in a judgment under review. *City of Newman Grove v. Primrose*, 240 Neb. 70, 480 N.W.2d 408 (1992). In our de novo trial, we must bear in mind that reformation of a contract may not be granted unless a mistake sufficient to justify reformation is established by clear and convincing evidence. *Darr v. D.R.S. Investments*, 232 Neb. 507, 441 N.W.2d 197 (1989).

## GENERAL DISCUSSION

The record contains a great deal of evidence that we regard as immaterial. Therefore, we have not summarized that evidence in this opinion, nor have we stated the parties' arguments which tend to use this immaterial evidence to support a general claim that the other party was somehow inequitable in negotiating the April 21 contract.

## YORK WAS NOT A VOLUNTEER

The trial court found that York was a volunteer when it paid off the liens on January 22, 1990. This finding ignores the contract the parties entered into on December 15, 1989, which was still the controlling contract until April 21, 1990. The December 15 contract includes a provision that it contains the parties' entire agreement. Its terms could not be contradicted by prior agreement or contemporaneous oral agreement. See Neb. U.C.C. § 2-202 (Reissue 1992).

In this analysis, we are interested in machinery (goods) that Ashwill traded in to York. Under the Uniform Commercial Code, Ashwill is a seller of that machinery. See Neb. U.C.C. § 2-304 (Reissue 1992). That machinery, unlike the machinery Ashwill was buying, was identified. The April 21 agreement did not provide a delivery date of that machinery, but it did provide that the machinery traded in was part of the downpayment. Since the agreement did not otherwise provide, title to that property passed at delivery. See Neb. U.C.C. § 2-401 (Reissue 1992).

Since title on the trade-in machinery passed to York before it paid the liens, and because York purchased the property subject to the liens, York was entitled to, and even obligated to, pay off the liens. Therefore, York was not a volunteer when it paid off the liens on its own property. The trial court erred as a matter of

law when it found that York paid the liens to John Deere as a volunteer.

Examining the provisions of the December 15 contract reinforces these findings. The reverse side of the contract provides, "The trade-in allowance set forth herein is based upon an appraisal by the seller . . . free of all liens except as stated herein." Also contained on the reverse side of the form is the following:

> In case the purchaser refuses to . . . settle . . . the seller may retain as liquidated damages all moneys or equipment paid on account of said equipment, not exceeding, however, twenty-five percent of the purchase price . . . trade-in equipment taken by the seller in part payment shall be accounted for at the price at which resold, less expense of reconditioning, handling and selling.

After providing that property traded in is valued at its present value, free of liens, the December 15 contract states:

> Such trade-in shall be subject to reappraisal by seller at the time it is delivered to seller and if it is reappraised at a different value than the trade-in allowance . . . because [it is in different condition], or because it is subject to a lien not set forth herein, [the trade-in allowance shall be changed].

These provisions of the December 15 contract merely reinforce the conclusion that York had the right to sell the tractors when York obtained possession of them and was not acting as a volunteer when it paid the liens.

The trial court found that Ashwill was entitled to cancel the December 15 contract. We cannot find any reason why either party could unilaterally cancel that contract, but of course the parties could modify, replace, or cancel it by mutual agreement.

■ Before the April 21 contract was entered into, Ashwill was contractually bound to buy and take delivery of the machinery he contracted to buy.

> "A contract complete in itself will be conclusively presumed to supersede and discharge another one made prior thereto between the same parties concerning the same subject matter, where the terms of the latter are inconsistent with those of the former so that they cannot

subsist together. However, deviations or changes in a contract do not necessarily abrogate it or imply its abandonment, and where it is claimed that by reason of inconsistency between the terms of the new agreement and those of the old the old one is discharged, the fact that such was the intention of the parties must clearly appear." *Caro, Inc. v. Roby*, 215 Neb. 897, 904-05, 342 N.W.2d 182, 186 (1983) (quoting 17A C.J.S. *Contracts* § 395 (1963)). Accord *In re Estate of Wise*, 144 Neb. 273, 13 N.W.2d 146 (1944).

The April 21 contract clearly superseded the December 15 contract, insofar as the two were inconsistent. The major changes concerned the property being purchased and traded in, as well as the long-term financing. The other provisions covering traded-in machinery are essentially the same. York's valuation of the property traded in was placed on both contracts, and the amount of the liens against the property was subtracted to get the net value of the machinery traded in. The December 15 contract provides on the back page that the trade in is valued at its present value, free of liens, and the April 21 contract provides on the front page, "Purchaser hereby conveys to Seller the Trade-In Equipment free and clear of all encumbrances except as noted above." Furthermore, Neb. U.C.C. § 2-312(1) (Reissue 1992) provides in significant part: "[T]here is in a contract for sale a warranty by the seller that . . . (b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge." This warranty is excluded only by specific language or circumstances showing the buyer that the seller is purporting to sell only such right as the seller may have. § 2-312(2). The April 21 contract therefore gives both an express and an implied warranty against liens not listed on the contract.

Ashwill testified that he told Darwin Shriver and Dan Reiter that York-was responsible for learning the amount of the liens against his property. Ashwill indicated this was his standard business practice. Time and time again he reiterated in his testimony that a dealer that accepts a trade-in is responsible for determining the amount of any lien on the machinery being traded in. Ashwill also testified that he was only interested in

the bottom line of the April 21 contract, and the trial court found that to be true. Ashwill's intent, not expressed in the written contract of April 21, obviously does not determine the outcome of this contract action.

A listing of some of the basic rules of contract construction would be helpful at this point. The construction of a written contract is a question of law for the court. *International Harvester Credit Corp. v. Lech*, 231 Neb. 798, 438 N.W.2d 474 (1989). There is a strong presumption that a written instrument correctly expresses the intention of the parties. *Id*. Parties are bound by the terms of the contract, even though their intent may be different from that expressed in the agreement. *Id*. " 'In construing a written instrument for the purpose of ascertaining the intention of the parties, resort must be had to the instrument as a whole and, if possible, effect must be given to every part thereof. . . .' " *Mills v. Aetna Ins. Co.*, 168 Neb. 612, 619, 96 N.W.2d 721, 725 (1959). Ashwill cannot expunge the remainder of the April 21 contract merely by testifying that he was only interested in the bottom line.

Ashwill implied in his testimony that York changed the trade-in value of the equipment to come to a bottom-line figure he would have to pay. The April 21 contract provides that the trade-in value is the value placed on the equipment by York, and, therefore, changing this amount indicates nothing except York's willingness to negotiate this amount. As long as the April 21 contract contains the other provisions, this process does not tend to prove the bottom line was more controlling than any other provision of the contract.

The April 21 contract must necessarily be construed to mean that York sold certain specific, equipment to Ashwill for $1,138,377. This sum was payable by a cash downpayment; a $1,000,341.08 allowance for machinery traded in, less the value of the liens upon that property; and a balance of cash payable in installments at 12 percent interest commencing September 1, 1990. To be sure, the amount of the liens listed on the April 21 contract was in error. Interestingly, Ashwill does not argue that the value of the liens was correct, but merely that the error was not mutual.

"In this jurisdiction, reformation may be decreed where

there has been a mutual mistake or where there has been a unilateral mistake caused by the fraud or inequitable conduct of the other party." *J. J. Schaefer Livestock Hauling v. Gretna St. Bank*, 229 Neb. 580, 589, 428 N.W.2d 185, 191 (1988).

 A mutual mistake is a belief shared by the parties which is not in accord with the facts. A mutual mistake is one common to both parties in reference to the instrument to be reformed, each party laboring under the same misconception about their instrument. *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986). As stated by this court in *Newton*, " 'A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties.' [Citation omitted.]

"If incorrect language or wording is inserted by mistake, including a scrivener's mistake, into an instrument intended to reflect the agreement of the parties, such mistake is mutual and contrary to the real intention and agreement of the parties."

*Omaha Door Co. v. Mexican Food Manuf. of Omaha*, 232 Neb. 153, 157, 439 N.W.2d 776, 780 (1989). See, also, Restatement (Second) of Contracts § 151 (1981).

The trial court found that every entry on the April 21 contract was verified by the York representatives and that this mistake was York's, not Ashwill's, and therefore concluded that the mistake was not mutual. This conclusion focuses on the wrong mistake and is therefore error.

In the introductory note to the Restatement, *supra*, ch. 6 at 379, that authority states:

The type of mistake dealt with in this Chapter [on mistake] is one that relates to existing facts that the parties regard as a basis for making an agreement. An important sub-category of such mistake is mistake as to expression, in which the mistake relates to the contents or effect of a writing that expresses an agreement.

"A mistake is a belief that is not in accord with the facts." *Id.*, § 151 at 383. "In this Restatement the word 'mistake' is used to refer to an erroneous belief. A party's erroneous belief is

therefore said to be a 'mistake' of that party." *Id.*, comment *a.* at 383.

Verification of the wrong amount is the cause of the mistake, not the mistake. The significant mistake, as shown by the above-quoted authority, is that the prepared document failed to correctly reflect the total amount of the liens which Ashwill had on the equipment that he traded in. There is no doubt that the parties agreed Ashwill would trade in to York equipment that was either subject to disclosed liens or free of liens. The terms of the written agreement of April 21 disclose that the parties did not intend York to take title subject to any liens except those listed on the contract.

In view of the terms of the April 21 contract which provided that Ashwill was warranting the property to be free of liens except for those disclosed, Ashwill must necessarily have believed the lien figure was correct, or he knew the figure in the contract was wrong, and he remained silent, thus engaging in inequitable conduct. There is no credible evidence that the York representatives did not believe they were using the correct figure, and there is no credible evidence that Ashwill did not believe the April 21 contract contained the correct figure. The parties held a belief that was not in accord with the facts, which belief was that the April 21 contract reflected the correct total of the liens against the equipment which was traded in, and that is a mistake. Expressed in another manner, the evidence establishes clearly and convincingly that the scrivener did not prepare the contract of April 21 to reflect the parties' agreement. This is a mutual mistake, and York is entitled to have the contract of April 21 reformed.

## CONCLUSION

York also argues that it is entitled to relief on the ground that Ashwill was unjustly enriched or that it is subrogated to John Deere's rights against Ashwill. Since we have determined York is entitled to a reformation of the April 21 contract, it is unnecessary to consider these other theories of recovery.

The record establishes that the April 21 contract has been paid in full and that Ashwill no longer owns the machinery that would be security for the unpaid balance. Therefore, the most

efficient and equitable relief would be a judgment computed under the April 21 contract, that is, York should be awarded judgment for $109,397.67, plus interest at 12 percent per annum, the interest rate provided in the contract, from September 1, 1990, and the costs of this action.

REVERSED AND REMANDED WITH DIRECTIONS.