ROY L. DUNN, APPELLANT, V. MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION, APPELLEE.

282 N. W. 487

FILED NOVEMBER 26, 1938.   No. 30420.

*Foster & Yates,* for appellant.

*Cleary, Horan & Skutt, contra.*

Heard before ROSE, C. J., EBERLY, PAINE, CARTER and MESSMORE, JJ.

CARTER, J.

This is an action by an agent to recover from his principal the amount alleged to be due under an express agreement for hire. The plaintiff's petition consisted of four causes of action, the second of which was dismissed by plaintiff during the course of the trial. The trial court sustained plaintiff's motion for a directed verdict as to the third cause of action and a judgment was entered thereon. On the first and fourth causes of action the court directed verdicts for the defendant and from these orders the plaintiff appeals.

The evidence shows that plaintiff entered into a written contract with the Mutual Benefit Health & Accident Association of Omaha, hereafter referred to as the defendant, by which he agreed to represent the defendant as its general agent in the Great Falls district in Montana. As a consideration, plaintiff was to receive certain stated commissions on first premiums on policies based upon applications solicited by him in his territory, also the overwrite on all premiums based upon policies sold by his sub-agents, a collection fee on all premiums collected through his office in Great Falls and an overwrite collection fee on all premiums collected at points where the defendant company had not appointed local treasurers. The duties of the plaintiff were set forth in the contract in the following words: "In consideration of this appointment the second party hereby accepts said appointment subject to all provisions and conditions of this contract and agrees to devote his time and energy to the duties as agent for the association and to act exclusively for it and to advance its best interests subject to such instructions as have been or may hereafter be given by the association."

Plaintiff alleges that C. C. Criss, treasurer of the defendant company, during the negotiations with the plain-

tiff, orally agreed with plaintiff as follows: "That they would like to have him adjust and settle a few minor claims in Great Falls, Montana; that the adjusting of the claims would assist plaintiff in making contacts and help him to write insurance; that if the adjusting of the claims became burdensome or took up the time that he should be giving to the writing of insurance, that the company, in that case, would either send a claim adjuster to take care of the claims or would pay plaintiff additional compensation for his time and recompense him for his expenses." Plaintiff testified that he adjusted 2,157 claims for losses that were not covered by his contract of hire and that the reasonable value of his services in handling them was $10,000.

. According to the evidence, plaintiff went to Great Falls and took over the office about June 10, 1930. The contract was not finally approved by an executive officer of the defendant, as required by the contract itself, until June 16, 1930. We are of the opinion that the alleged oral agreement cannot be admitted in evidence to contradict or vary the terms of the written agreement, it having been made as a part of the preliminary negotiations leading up to the making of the written contract. *Sylvester v. Carpenter Paper Co.,* 55 Neb. 621, 75 N. W. 1092; *Crook v. O'Shea,* 126 Neb. 67, 252 N. W. 456; *Weidenfeld v. Olson,* 132 Neb. 303, 271 N. W. 806. The provisions of the contract heretofore set forth relating to the services to be performed by plaintiff are indefinite and uncertain in some respects. We know of no better way of determining the intent of the parties than by giving the contract the effect that the parties themselves gave it. Plaintiff worked under the contract for 33 months and during that time there were many acts and much correspondence which bear directly upon the meaning of the contract as the parties themselves construed it.

The record discloses that plaintiff took over the agency about June 10, 1930. On June 14, 1930, plaintiff wrote the company treasurer that "there were around one hundred unpaid claims on file in this office when I arrived." While

the plaintiff contends that these claims were taken in to the home office, nevertheless it appears that they were soon in his hands for handling. It is clear, therefore, that plaintiff commenced handling claims almost from the very beginning of the employment. This is established in a letter from plaintiff to the company treasurer under date of June 25, 1930, in which he said that we "have waded in with the result that we have the collections running along smoothly and the pending claims taken care of up to date."

On October 16, 1931, the assistant secretary of the company wrote to the plaintiff regarding a charge of $300 for the office equipment in the Great Falls office as follows: "We were informed further that your claim adjustments have been meeting with the approval of the claims committee and it seems quite likely that you are spending a good deal of time on them. In view of all this, and further in view of the fact that probably in the future you will be called upon to take care of unusual situations which might arise, we are asking the accounting department to relieve your account of the $300 charge and you will not be annoyed further about it."

On December 9, 1931, plaintiff wrote the company's agency director in part as follows: "There are many of the collections on accounts which are notified to pay this office who for some reason or other remit direct to the home office. We get nothing whatever by way of returns out of these accounts but we do get all of the claims to pay that arise from this very business who pay direct to the home office, and when I say that these claims take up 75% of our time, I am putting it mildly. Then too the postage is no small item in the handling of these claims. On the whole works where the business is paid direct into the home office we do not realize a cent. We have come to the place where we must get something for our work on claims and we don't know of any other source from which to expect it; if you do we would certainly be glad to hear from you."

On June 30, 1932, the company's superintendent of claims wrote the plaintiff as follows: "We have your letter with further reference to compensation for handling claims and in replying beg to advise that in view of the fact that we are in the midst of one of the greatest financial stringencies the country has ever known, during this time and in view of the fact that we find it absolutely necessary to cut salaries and expenses wherever possible, we do not feel that we could, right at this time, recommend any increase of expenditure on the part of the association."

And on August 23, 1932, plaintiff wrote the agency director of the company as follows: "This claim situation is very serious in Montana and I find it is the same all over the country. It takes practically all my whole time and as you know I don't get anything from settling claims but have to depend upon the collections and on the new business which I get off the territory."

We have examined all the correspondence in the record and nowhere does the plaintiff claim that he was entitled to additional compensation for handling claims under an agreement. We are of the opinion that the evidence quoted herein clearly indicates that plaintiff knew that he was to handle claims as a part of the services to be rendered under the written contract. He used the fact that the work on claims was excessive as a basis for obtaining the cancelation of the $300 charge for office equipment. He attempted to get his commission schedule increased for the same reason. He also requested financial assistance on his office overhead because of the volume of claims he was required to handle. He, likewise, requested that he be allowed commissions on collections sent direct to the company office as an additional compensation for his work in handling these claims. But at no time did he claim any right under an agreement to additional compensation for handling claims during the 33 months he was in defendant's employ. At various times he had the assistance of four claim adjusters sent out by the home office. As late as August 23, 1932, he wrote "and as you know I don't get anything

from settling claims but have to depend upon the collections and on the new business which I get off the territory." We are not unmindful of the fact that the contract was prepared by the defendant and that, in the event of ambiguity or indefiniteness, it would ordinarily be construed against the party making it. But the fact remains that both parties gave the contract the same construction during the whole period that the contract was in force.

Whether the handling of claims was a part of the duties to be performed by the plaintiff under his contract with the defendant is indefinite and uncertain and, in our opinion, constitutes an ambiguity. The evidence shows that, during the 33 months that plaintiff worked under the contract, both parties considered that the handling of claims was a part of plaintiff's duties under that part of the contract hereinbefore quoted. The court is entitled, we think, to place the same construction on the contract. The following rules of interpretation apply:

"In the determination of the meaning of an indefinite or ambiguous contract, the interpretation placed upon the contract by the parties themselves is to be considered by the court and is entitled to great, if not controlling, influence in ascertaining their understanding of its terms. In fact the courts will generally follow such practical interpretation of a doubtful contract. It is to be assumed that parties to a contract know best what was meant by its terms and are the least likely to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights; and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be." 12 Am. Jur. 787, sec. 249.

"The interpretation or construction given contracts by the parties to them, while engaged in their performance before any controversy has arisen, is one of the best indications of their true intent and meaning, and the courts should ordinarily enforce such construction." *Hull Co. v. Westerfield*, 107 Neb. 705, 186 N. W. 992. See, also, *Ord*

*Hardware Co. v. J. I. Case Threshing Machine Co.*, 83 Neb. 353, 119 N. W. 682; *Cady v. Travelers Ins. Co.*, 93 Neb. 634, 142 N. W. 107; *Farmers Ed. & Coop. Union v. Farmers Ed. & Coop. State Union*, 133 Neb. 397, 275 N. W. 464; 4 Neb. Law Bulletin, 149.

The parties having construed the contract as including the handling of claims during the 33 months that parties operated under it, the plaintiff cannot now urge a different interpretation. Whether the alleged oral agreement was admissible in evidence for any purpose in this case, it is not necessary for us to decide. In any event, the contract, whether it be that which was reduced to writing alone, or whether it be the written instrument as explained by the oral agreement, is subject to the construction placed upon it by the parties. The trial court was right in directing a verdict on the first cause of action.

Plaintiff also complains of the action of the trial court in directing a verdict against him on his fourth cause of action. The evidence discloses that defendant employed plaintiff as a claim adjuster, after he returned from Great Falls, at a salary of $150 a month. The fourth cause of action alleges that plaintiff was not paid for the month commencing June 10, 1932, and it is for this amount that he sues. The evidence disclosed that plaintiff did not adjust any claims following June 10, 1932. It appears that plaintiff was totally disabled on and subsequent to June 10, 1932, and that he performed no services for defendant during that period. Plaintiff was paid total disability benefits by the defendant company during the time of his disability. Upon this evidence, the trial court directed a verdict for the defendant, and, we think, correctly so. The plaintiff failed to make a case, and, under such circumstances, it is the duty of the court to direct a verdict.

The judgment of the trial court is in all respects correct and it is

AFFIRMED.