RESOLUTION TRUST CORPORATION, RECEIVER FOR CITY SAVINGS, F.S.B., APPELLEE, V. DIAL COMPANIES, INC., A NEBRASKA CORPORATION, APPELLANT.

564 N.W.2d 260

Filed May 13, 1997.    No. A-96-002.

Charles O. Forrest and Tami R. Weissert, of Schmid, Mooney & Frederick, P.C., for appellant.

Lawrence K. Sheehan, of Ellick. Jones, Buelt, Blazek & Longo, for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and INBODY, Judges.

HANNON, Judge.

The Resolution Trust Corporation (RTC), receiver for City Savings, F.S.B., sued Dial Companies, Inc. (Dial), to recover an $87,890 credit that Dial received against the purchase price of a large promissory note Dial purchased from RTC. RTC alleges that Dial was given too large a credit by mistake and was unjustly enriched, and seeks this recovery on a theory of reformation of the agreement by which the promissory note was sold. The trial court found in favor of RTC on the basis of unilateral mistake and entered judgment against Dial in the amount of $87,890, plus costs. We conclude that RTC was entitled to reformation and restitution under either the unilateral or mutual mistaken analysis, and, therefore, we affirm the order of the trial court.

RTC is an institution founded by the federal government to act as a receiver for the assets of failed financial institutions. It takes possession of the assets, oversees them, and attempts to liquidate them in an orderly fashion and thereby realize the greatest sum possible. RTC was appointed the receiver of City Savings, F.S.B., and as such became the owner of a certain promissory note and the related rights securing that note by a trust deed in the Applewood Pointe Apartments located in Omaha, Nebraska (the apartment). The promissory note was in the face amount of $8 million, and when RTC sold it to Dial, its unpaid balance was in excess of that amount. The apartment was worth considerably less than the lien against it.

The trust deed used to secure the loan document contains a provision that if the beneficiary (owner of promissory note) so

requests, the trustor (borrower) agrees to add to each periodic payment required by the note an amount estimated by the beneficiary to be sufficient to enable the beneficiary to pay all taxes, assessments, and other charges at least 30 days before they become delinquent. Before the 1991 real estate taxes were paid by RTC on March 5, 1992, the escrow account for taxes and insurance had a balance of $91,326.57. RTC also held a "capital improvements" escrow account of $97,943.67.

RTC conducts a great deal of its business through managers it contracts with to perform certain functions. RPC-Mitchell Title, Inc. (RPC), is a corporation with which RTC had contracted to manage and liquidate some of its assets, including the apartment loan in question. Scott Budinsky was the RPC representative who actually did the work for RPC in liquidating the apartment loan on RTC's behalf. Under the system used by RTC, RPC manages and disposes of certain assets, including the apartment loan, but the loans are serviced through a service center which is operated either by RTC or by some other independent contractor. The apartment loan was serviced out of Atlanta, Georgia. Money paid by borrowers on loans is paid to the service center. The service center keeps track of the loan balances and the escrow funds, and pays the real estate taxes from an escrow account. On a monthly basis, Budinsky would receive a servicing report from the service center, which showed such information as the balance of the escrow accounts.

Technically, an asset which RPC receives from RTC to manage is available for sale immediately. However, a great deal of work is required before a given asset can be sold. Information about a given asset is made available to those interested in purchasing the loan, and interested parties make offers to RPC to purchase a given asset. RPC then negotiates with the prospective buyer on the price and terms that it is willing to recommend to RTC to sell the asset.

On September 10, 1991, Philip Gibson, representing Dial, sent Budinsky a "protocol" by which Dial offered to purchase the apartment loan for $4,300,000. This protocol was a written document describing the property Dial was interested in purchasing and its security (the apartment), accompanied by financial and other information intended to convince RPC and RTC

officials that RTC should sell the asset for the price Dial was offering. After the September 10 offer, RPC, through Budinsky, and Dial, through Gibson, negotiated by letter and telephone for the sale of the promissory note secured by the apartment, and on December 31, Budinsky wrote to Gibson that RTC had agreed to sell the note and mortgage for $5,040,000. The evidence does not show that the escrow account balances or the status of the real estate taxes were mentioned during these negotiations. A formal agreement was clearly expected.

The loan sale agreement dated March 27, 1992, was ultimately executed by the appropriate representatives of RTC and Dial. That agreement provides for the sale of the promissory note, all documents and liens covering that note, and all amounts contained in the escrow account for capital improvements and for real estate taxes and insurance for $5,040,000. The document states that Dial was to receive the balances of the escrow accounts, and it shows the balance of the taxes and insurance account to be $91,326.57. Immediately following this statement, the document states, "Funding Date. April 2, 1992." It contains numerous provisions by which RTC disclaimed every imaginable guarantee of the property it was selling. The agreement provides the seller sells "all payments of principal and interest on, and all proceeds with respect to, such Loan after the Funding Date . . . all amounts contained in the Escrow Accounts."

Budinsky testified that it was his responsibility to find out the balances of the escrow accounts. He testified that he was receiving monthly printouts from the service center. He believed that he called the service center on the date of the closing, March 27, 1992, or earlier, and that he probably confirmed it again on April 2, "the funding date."

Gibson also testified about his handling of the closing for Dial. He testified that prior to closing, he was told the escrow balances for the taxes and insurance. He had gone to Pennsylvania to review the loan files in the fall of 1992, and there was nothing in the loan file with regard to escrow account balances. At the time of the closing, Gibson knew that the first half of the taxes on the apartment was paid through a title insurance commitment update he had received in connection with the

purchase. Gibson testified that he believed that sometime in February or early March he was aware that the escrow balance for taxes was in the neighborhood of $90,000. He testified he had no way of knowing what the correct balance was on the date the contract for sale was signed by the buyer. He testified he relied upon the representations made by RTC officials as to the balance of the escrow account.

When the sale was closed, Dial paid $5,040,000, less the escrow account balances shown in the contract and less the $50,000 that Dial had paid during negotiations to show good faith. Insofar as the taxes and insurance escrow account is concerned, the credit allowed to Dial was $91,326.57.

From a computer printout introduced into evidence, Budinsky testified that real estate taxes of $87,890 were paid to Douglas County on February 28. A check dated February 28, 1992, payable to Douglas County in that amount is in evidence. After deducting that check, the escrow account for taxes and insurance had a balance of $3,436.57. Other documents in evidence show that these taxes were paid on the records of Douglas County on March 5. Budinsky testified that prior to the execution of the loan sale agreement, he did not have any knowledge that the taxes were paid prior to the execution of the loan sale agreement. Budinsky testified that he discovered the error when he received the monthly service report a few days after April 2.

## ASSIGNMENTS OF ERROR

Dial alleges the trial court erred (1) in finding a voluntary payment and unjust enrichment and (2) in refusing to grant Dial's motion for a new trial.

## STANDARD OF REVIEW

In an appeal from an equitable action, an appellate court reviews the action de novo on the record and reaches a conclusion independent of the factual findings of the lower court, but if credible evidence is in conflict on a material issue of fact, then the appellate court considers and may give weight to the circumstances that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Moulton v. Board of Zoning Appeals*, 251 Neb. 95, 555 N.W.2d 39 (1996).

## DISCUSSION

At the time the contract was drawn, there was $3,436.57 in the escrow account. Due to an error, the escrow account mistakenly showed a balance of $91,326.57. Therefore, Dial was given credit for the taxes and insurance escrow account that was $87,890 more than was actually in that account.

The parties' arguments are based upon the premise that the mistake upon which RTC seeks relief is a unilateral mistake. To understand the nature of the mistake in this case, it would be well to analyze the parties' transaction in light of the situation they were in when the sale was closed and Dial was given a credit for the taxes and insurance escrow account that was $87,890 more than was actually in that account. The contract specifically provided that Dial was to receive an escrow account with a balance that was $87,890 more than was in that account at the time the contract was drawn, apparently notwithstanding the date the contract was signed at the time of closing, that is, April 2, 1992.

In their briefs, the parties cite and argue the cases and principles which are listed below. The rules expressed in those cases are mainly concerning payment, and they tend to fit this case only if one treats the credit Dial was given as a payment to RTC and overlooks the fact that the parties entered into a contract containing the same mistake. The following authorities, if slightly modified to fit the situation of this case, do contain helpful principles.

"When a unilateral mistake is made and a party receives the benefit of that mistake, before the mistaken payor can recover the mistaken payment, it must also show that the person receiving the payment has been unjustly enriched." *Wendell's, Inc. v. Malmkar*, 225 Neb. 341, 350-51, 405 N.W.2d 562, 569 (1987).

In accordance with the rules relating to the burden of proof in civil actions generally, the burden is on one seeking to recover payments made to prove the facts entitling him to recovery. [Citation omitted.] Ordinarily a party suing to recover an alleged overpayment on a contract has not only the burden of proving the overpayment but also the burden of proving that the overpayment was involuntary.

*Hersch Buildings, Inc. v. Steinbrecher*, 198 Neb. 486, 489-90, 253 N.W.2d 310, 312 (1977).

" 'All payments are presumed to be voluntary until the contrary is made to appear, and the burden rests on the party seeking to recover a payment to prove that it was involuntary.' " *Wendell's, Inc.*, 225 Neb. at 349-50, 405 N.W.2d at 568. We define "involuntary" as " '[n]ot proceeding from choice.' " *Globe Indemnity Co. v. Thayer County Bank*, 135 Neb. 484, 488, 282 N.W. 400, 402 (1938). Webster's Third New International Dictionary, Unabridged 1191 (1993) defines it as "springing from accident or impulse rather than conscious exercise of the will." The *Wendell's, Inc.*, court stated, "Plaintiff's actions were involuntary in the sense they were the result of a mistake of fact, if the jury so found." 225 Neb. at 350, 405 N.W.2d 569. The above cases establish that a payment may be involuntary if the payor makes the payment under a legal obligation or by accident or by mistake.

Budinsky, or perhaps some other agent of RTC, clearly made a mistake. Under *Wendell's, Inc.*, the credit was given involuntarily because RTC did so as a result of a mistake. Furthermore, when it paid the 1991 real estate taxes less than a month before they were delinquent, it was fulfilling a legal duty. The trust deed provides that the borrower is to pay into the escrow account an amount sufficient to pay the real estate taxes at least 30 days before they become delinquent. Like most lender-drafted instruments, the trust deed does not specifically provide that the lender was to pay that money toward the taxes before they became delinquent, but such a duty would clearly be implied. The first half of the real estate taxes for 1991 in Omaha, where the apartment is located, would have been delinquent on April 1, 1992. See Neb. Rev. Stat. § 77-204 (Reissue 1996). RTC therefore paid the taxes when the money was in the account and just shortly before it was clearly obligated to do so. In that sense, the payment of taxes was involuntary.

However, there were two parties to the contract of sale and to the computation of the wrong credit when the sale was closed. Both parties were wrong in their belief of the balance of the escrow account. The case is more correctly analyzed under mutual mistake. Apparently, this approach was overlooked, because the mistake clearly originated with RTC.

The mistake in this case is analytically close to the mistake made by the seller in *York Equip., Inc. v. Ashwill*, 2 Neb. App. 374, 510 N.W.2d 79 (1993). In that case, York Equipment sold Ashwill $1,138,377 of new farm equipment and took used equipment valued by the parties for $570,141 as a downpayment. The used equipment was subject to a lien which was subtracted from the value of the used equipment to determine the net downpayment Ashwill was making on the new equipment. The balance of the cost of the new equipment was carried by York Equipment on an installment contract. The parties made an initial contract on December 15 but changed it because Ashwill decided to purchase more equipment. York Equipment contacted the party holding the liens on the equipment both in December and in April. York Equipment paid some liens shortly after the December contract but overlooked that fact when the final contract was drawn in April. Just before the second contract was drawn, York Equipment contacted the lienholder again and found that some liens had been paid but overlooked the fact that York Equipment was the party that paid them. As a result, the final contract showed a balance due after the downpayment that was too low by the amount of the liens that York Equipment had paid. York Equipment sued to reform the contract, and we granted reformation on the basis of mutual mistake.

■ In *York Equip., Inc.*, we concluded that York Equipment had made a unilateral mistake, but that mistake was not the mistake upon which York Equipment relied as grounds for reformation. We concluded that the mistake that justified rescission was a mutual mistake, that is, when the final contract was signed, neither party realized that York Equipment had paid the liens down. The applicable principles are as follows:

A mutual mistake is a belief shared by the parties which is not in accord with the facts. A mutual mistake is one common to both parties in reference to the instrument to be reformed, each party laboring under the same misconception about their instrument. *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986). As stated by this court in *Newton*, " 'A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form

does not express what was really intended by the parties.' " [Citation omitted.]

"If incorrect language or wording is inserted by mistake, including a scrivener's mistake, into an instrument intended to reflect the agreement of the parties, such mistake is mutual and contrary to the real intention and agreement of the parties."

*Omaha Door Co. v. Mexican Food Manuf. of Omaha*, 232 Neb. 153, 157, 439 N.W.2d 776, 780 (1989). See, also, Restatement (Second) of Contracts § 151 (1981).

In the introductory note to the Restatement, *supra*, ch. 6 at 379, that authority states: "The type of mistake dealt with in this Chapter [on mistake] is one that relates to existing facts that the parties regard as a basis for making an agreement. An important sub-category of such mistake is mistake as to expression, in which the mistake relates to the contents or effect of a writing that expresses an agreement."

"A mistake is a belief that is not in accord with the facts." *Id.*, § 151 at 383. "In this Restatement, the word 'mistake' is used to refer to an erroneous belief. A party's erroneous belief is therefore said to be a 'mistake' of that party." *Id.*, comment *a.* at 383.

*York Equip., Inc.*, 2 Neb. App. at 386-87, 510 N.W.2d at 86.

In the case at hand, before March 27, 1992, there was a nonbinding agreement for the sale of the loan for $5,040,000. The evidence does not disclose any agreement with regard to RTC's obligation to pay the real estate taxes on the apartment to a certain date, and the evidence clearly shows both parties thought the escrow account was larger than it was. Budinsky testified that he learned what the balance was, and Gibson testified that before the contract, he knew, undoubtedly from Budinsky or some other representative of RTC, that the account balance was in the neighborhood of $90,000. It is clear from the evidence that before and when the contract was drawn and when the wrong credit was given, both parties believed that the escrow account balance was $87,890 higher than it was. Because of that erroneous mutual belief, the wrong figure was placed in the contract, and Dial was given credit against the purchase price of $87,890 too much and was unjustly enriched by that amount.

RTC was entitled to have the contract reformed and to recover $87,890. The trial court was correct, and its order is affirmed.

AFFIRMED.