Tim R. Eisenhart, Personal Representative of the
Estate of Kenneth D. Eisenhart, deceased, appellee,
v. Craig Lobb et al., appellants.
647 N.W.2d 96

Filed May 14, 2002.   No. A-00-1176.

D. Eugene Garner, of Mousel, Garner & Rasmussen, for appellants.

Daylene A. Bennett, of Burger & Bennett, P.C., for appellee.

Sievers, Carlson, and Moore, Judges.

Sievers, Judge.

This case involves a deed executed and filed over 15 years ago, which is alleged to contain a mutual mistake and to not reflect the intention of the parties to the deed. At the heart of this case is approximately 415 acres of farm ground in Hitchcock County, Nebraska. While the complete legal descriptions of the land are in the pleadings below, for convenience, we will refer to the land as "section 9" and "section 19," which designations more readily lend themselves to an understandable narrative.

Kenneth D. Eisenhart and Ruth Harrington (Ruth) were brother and sister, and upon the death of their father in 1972, they inherited the "Eisenhart farm," which land included portions of sections 9 and 19. From 1972 forward, Ruth managed the farm for Kenneth and herself, which they held in undivided shares. Kenneth and Lois Lobb were married on July 17, 1984, when both were in their sixties and after previous marriages to others. They lived in Utah. Because Ruth was having some financial problems, Ruth and Kenneth made a deal in 1986 to separate out their interests in the Eisenhart farm. The arrangement was that Ruth would own all land of the farm located in section 19 and that Kenneth would have the farm's land in section 9. At this

time, Kenneth was married to Lois. Ruth received all of section 19 by a quitclaim deed from Kenneth and Lois, after which Ruth sold the ground.

This lawsuit was spawned by Ruth's quitclaim deed of February 18, 1986, in which she conveyed her interest in section 9 naming Kenneth and Lois as grantees, as "[h]usband and [w]ife," which if effective, would give Lois an interest in the portion of the Eisenhart farm located in section 9. It is of some significance that Kenneth and Lois had entered into a prenuptial agreement at the time of their marriage in 1984, which, among other things, provided that their separate property would remain separate. And they prepared mutual wills, reciting that they were making no provision for each other. However, in the fall of 1992, Kenneth and Lois divorced, and the trial court in that divorce divided their property in accordance with the prenuptial agreement. The divorce decree did not mention section 9. Kenneth died on July 23, 1997, and Lois died on February 14, 1998.

In the instant case, Lois' children, Craig Lobb, Richard Lobb, and Carolyn Lobb-Larsen (collectively the Lobbs), claim that Lois, by virtue of Ruth's February 18, 1986, quitclaim deed to Kenneth and Lois, acquired an undivided one-fourth interest to the land in section 9. The opposing view is taken by Tim R. Eisenhart, personal representative of the estate of his father, Kenneth, as he claims that the inclusion of Lois on Ruth's deed to Kenneth was a mutual mistake and did not reflect their intent that the land be conveyed to just Kenneth. Thus, Tim filed suit to reform the deed to reflect that it was a conveyance solely to Kenneth, and as a result, Lois and the Lobbs, claiming through her, have no right, title, or interest in section 9. The Lobbs assert that this action for reformation of the deed and to quiet title is barred by the statute of limitations.

## TRIAL COURT DECISION

Tim also asserted a claim that Kenneth had acquired section 9 by adverse possession. The trial court rejected that claim, which is not assigned as error, and we discuss it no further.

With respect to the claim for mutual mistake and reformation of the deed, the trial court rejected the Lobbs' statute of

limitations defense and found that the deed contained a mutual mistake when it was signed and recorded and that such mistake was contrary to the intention and agreement of the parties. Consequently, the trial court ordered that Ruth's deed be reformed so that Lois and those claiming through her would have no interest in, right to, or title to the real estate in section 9. The trial court found that all ownership and interest in section 9 was vested in Kenneth upon his death. Thus, the Lobbs' claim for partition of the land was dismissed. The Lobbs now appeal.

## ASSIGNMENTS OF ERROR

The Lobbs make numerous specific assignments of error which are best narrowed to two basic issues: (1) whether the statute of limitations bars Tim's action and (2) if the action is not time barred, whether there is clear and convincing admissible evidence of a mutual mistake by Kenneth and Ruth which includes the Lobbs' claim that the trial court erred in admitting hearsay evidence about Kenneth's intentions.

## STANDARD OF REVIEW

An action to reform a contract is an equity action, and appellate review of an equity action is by trial de novo on the record. *J.J. Schaefer Livestock Hauling v. Gretna St. Bank*, 229 Neb. 580, 428 N.W.2d 185 (1988). As to both questions of fact and questions of law, an appellate court is obligated to reach a conclusion independent of that reached by the trial court when conducting a review de novo on the record. *Village of Exeter v. Kahler*, 9 Neb. App. 1, 606 N.W.2d 862 (2000). However, where the credible evidence is in conflict on a material issue of fact, an appellate court may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts over the other. See *id.* In our de novo trial, we must bear in mind that reformation of a contract may not be granted unless a mistake sufficient to justify reformation is established by clear and convincing evidence. *Darr v. D.R.S. Investments*, 232 Neb. 507, 441 N.W.2d 197 (1989); *York Equip., Inc. v. Ashwill*, 2 Neb. App. 374, 510 N.W.2d 79 (1993). The evidence is largely undisputed, remembering that of the people involved in the transaction at issue, only Ruth remains alive.

## ANALYSIS

*Statute of Limitations.*

■ The applicable statute of limitations here is Neb. Rev. Stat. § 25-207 (Reissue 1995). Under § 25-207, an action for relief from fraud must be brought within 4 years, but the cause of action does not accrue until the discovery of the fraud. In *Ainsfield v. More*, 30 Neb. 385, 403, 46 N.W. 828, 834 (1890), the Nebraska Supreme Court noted that "[a]ctions for relief on the ground of accident or mistake are not specifically mentioned in [§ 25-207], but these three, fraud, accident, and mistake, have been always classed together as the three great fountains of equity jurisprudence." Therefore, actions for accident or mistake, although not specifically mentioned in the statute, are classed with fraud and have a 4-year statute of limitations. *Sweley v. Fox*, 135 Neb. 780, 284 N.W. 318 (1939).

■ In *Wright v. Davis*, 28 Neb. 479, 44 N.W. 490 (1890), the court held that fraud will be deemed to have been discovered when such facts are known as would naturally suggest such inquiries as, if pursued, would lead to such knowledge. In other words, the statute of limitations period begins to run upon discovery of facts constituting fraud or facts sufficient to put a person of ordinary intelligence and prudence on inquiry which should lead to such discovery. *Jameson v. Graham*, 159 Neb. 202, 66 N.W.2d 417 (1954); § 25-207. If fraud or mistake ought to have been discovered, and would have been if reasonable diligence had been exercised by the plaintiff, the statute of limitations will run from the time such discovery ought to have been made, for a plaintiff cannot excuse delay in instituting suit on his or her cause of action if such failure to discover it is attributable to his or her own neglect. *Burchmore v. Byllesby & Co.*, 140 Neb. 603, 1 N.W.2d 327 (1941); *Sweley v. Fox*, 135 Neb. 780, 284 N.W. 318 (1939). The point at which a statute of limitations commences to run must be determined from the facts of each case. *Interholzinger v. Estate of Dent*, 214 Neb. 264, 333 N.W.2d 895 (1983).

■ We quickly dispose of the Lobbs' claim that the district court improperly denied their summary judgment motion concerning the statute of limitations. The denial of a motion for summary judgment is neither appealable nor reviewable. *McLain v.*

*Ortmeier,* 259 Neb. 750, 612 N.W.2d 217 (2000); *Doe v. Zedek,* 255 Neb. 963, 587 N.W.2d 885 (1999). The overruling of a motion for summary judgment does not decide any issue of fact or proposition of law affecting the subject matter of the litigation, but merely indicates that the court was not convinced by the record that there was not a genuine issue as to any material fact or that the party offering the motion was entitled to a judgment as a matter of law. *McLain v. Ortmeier, supra.* After trial, the merits should be judged in relation to the fully developed record, not whether a different judgment may have been warranted on the record at summary judgment. *Caruso v. Parkos,* 262 Neb. 961, 637 N.W.2d 351 (2002). Thus, we only examine the trial court's decision after trial.

◼ The Lobbs argue that Tim's petition alleges facts which in themselves show that the statute of limitations has run and that he failed to meet his burden of proof to show the case was not time barred. The general rule is that where a petition does not disclose on its face that it is barred by the statute of limitations, a defendant must plead the statute as an affirmative defense, and, in that event, the defendant has the burden to prove that defense. If, however, the petition on its face shows that the cause of action is time barred, the plaintiff must allege facts to avoid the bar of the statute of limitations and, at trial, has the burden to prove those facts. *DeSciose v. Chiles, Heider & Co.,* 239 Neb. 195, 476 N.W.2d 200 (1991).

Tim's petition alleges facts which would normally cause the reformation action to be barred by the statute of limitations. Specifically, the petition states that the deed was executed on February 18, 1986, and recorded 6 days later, and suit was filed on January 26, 1999. But the amended petition alleges that "[t]he mistake and error in the deed was not discovered until sometime after July 23, 1997." Having alleged facts showing that the statute had run and other facts which, if proved, would toll the statute, Tim had the burden to prove that his case was not time barred. Although at this point we are still discussing the statute of limitations, we observe that analysis of whether this alleged mutual mistake should have been discovered at a particular time necessarily intertwines with the analysis of whether there was actually a mutual mistake. For that reason, our decision on the

statute of limitations issue will largely determine whether a mutual mistake was proved.

The Lobbs argue that there are several dates upon which Ruth, Kenneth, and Lois had within their knowledge facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to discovery of the fact that Lois' name had been placed on the deed involving section 9, thereby barring the action.

First, the Lobbs argue that "[Ruth] signed the subject deed on February 18, 1986, and [it] was delivered to [Kenneth] and Lois Lobb . . . and then recorded on February 24, 1986." Brief for appellants at 14. If a mistake was made, according to the Lobbs, it was made on one of those two dates, and an action for reformation was barred 4 years later on February 24, 1990. Finally, at the latest, according to the Lobbs, the mistake should have been discovered in 1992 when Lois and Kenneth divorced. The Lobbs argue that Lois and Kenneth "examined their respective assets very thoroughly at that time." Brief for appellants at 20. But the reality is that the record contains little evidence about the divorce other than the final decree. Thus, as we explain later, the divorce really does not aid the Lobbs' arguments.

The record contains evidence that Ruth read the deed at the time she signed it as she testified that she always read documents before signing them. This fact, the Lobbs claim, precludes Tim's reformation action. Under the Lobbs' argument, the rule of law would be that if a grantor signs and delivers a deed with an error, that error is necessarily, and as a matter of law, discoverable then and there. Here, we have no direct knowledge about what Kenneth read or did at the time the deed was executed because of his death. The Lobbs argue that because Ruth testified she was Kenneth's "agent," her knowledge must be imputed to Kenneth. This argument misconstrues the evidence and is without supporting authority. Ruth testified that she was Kenneth's "agent" for managing the Eisenhart farm after their father's death. She never testified that she acted as Kenneth's agent in the transfer of land, and there was no other evidence upon which to base such a conclusion. Ultimately, the focus on Ruth ignores the real issue, which is whether Kenneth, who seeks reformation, albeit through his personal representative, should have discovered the mistake

at the time the deed was executed and delivered. The legal issue, as we see it, is whether a grantee is bound as a matter of law to read a deed, and appreciate its contents, at the time of delivery.

The Lobbs' view that a mistake must necessarily be discovered at the time a deed is executed is too narrow. If that were the law, there would be no need for the "discovery" rule extending the statute of limitations for actions seeking to correct mutual mistakes. Instead, all mistakes in deeds, and perhaps many other documents, would be "discoverable" upon execution and delivery, and the statute of limitations would never go beyond 4 years. The question of "discoverability" of a mistake is a more complex and multifaceted factual inquiry. And, on the most fundamental level, we must begin with the rule that carelessness or negligence in executing a written instrument does not stop a person from seeking reformation where the ground for relief is a mutual mistake of the parties. *Lippire v. Eckel*, 178 Neb. 643, 134 N.W.2d 802 (1965) (failure of parties to ascertain that property was incorrectly described not bar to reformation on ground of mutual mistake).

As for the Lobbs' argument that the mistake should have been discovered at the time the deed was recorded, the recording of a document is not of itself, under all circumstances, sufficient to charge all parties with notice of a mistake therein. *Sweley v. Fox*, 135 Neb. 780, 284 N.W. 318 (1939). In any event, the deed was recorded in Nebraska, while Kenneth lived in Utah, and thus the recording process itself seems to be a fact of little consequence, particularly given that the record is largely silent on how delivery and recording were accomplished.

We find that other facts are of more significance here on the interlaced questions of "discoverability" and whether there was a mutual mistake. When Kenneth and Lois divorced in Utah in 1992, their decree did not specifically mention section 9, as one would expect if it were a joint asset, or if either or both had some knowledge or expectation that it was jointly held. They had provided in 1984, in their prenuptial agreement, (1) that all property owned by each would remain separate, (2) that Kenneth owned real property in Nebraska listed on schedule B of the agreement, and (3) that Lois agreed to give up all rights to Kenneth's separate property. Schedule B, dated before Ruth

and Kenneth agreed to separate and divide out sections 9 and 19, specifically listed Kenneth's one-half share in the Nebraska farm as his separate property. In their 1992 divorce decree, Kenneth was awarded all items of property "currently in his own name or possession," which would include the Nebraska land as it had been described and treated in the prenuptial agreement. Plus, there is no evidence that Lois made a claim to the Nebraska land at the time of the Utah divorce decree, which we would expect, if she really thought that she had an interest in that land.

In short, this evidence shows that Kenneth believed his land remained his separate property notwithstanding his marriage to Lois or the contents of the 1986 deed. There is no evidence showing that Lois, Kenneth, or Ruth acted in any which would show that any of them held a belief or acted as if Lois had an interest in the Eisenhart farm. That we may look to the parties' conduct with regard to the land long after the deed itself was executed to decide the issues presented is consistent with the rule that the interpretation given a contract by the parties themselves, while engaged in their performance of it before any controversy has arisen, is one of the best indications of their true intent and should be given great, if not controlling, influence. *Dunn v. Mutual Benefit Health & Accident Ass'n*, 135 Neb. 506, 282 N.W. 487 (1938).

Examination of the parties' postdeed conduct was undertaken in one of the few Nebraska cases we have found in which the mistake at issue was the name of the grantee. See *Fisher v. Standard Investment Co.*, 145 Neb. 80, 15 N.W.2d 355 (1944). In this category of cases, we note *Hein v. W. T. Rawleigh Co.*, 167 Neb. 176, 92 N.W.2d 185 (1958), in which a deed was challenged by an heir on the ground that the wife did not intend to grant her husband an interest in the property. The court held:

> The burden of [the wife] was increased by the presumption which arises in any case in which a spouse puts the title to property in the other spouse. The law indulges a presumption in such a situation that the property was a gift. . . . The deed in the circumstances of this case is the best evidence of the intent and purpose of the parties thereto as to the interest conveyed and received.

*Id.* at 184, 92 N.W.2d at 190. The evidence, other than the deed, suggested that the wife was the sole intended owner. But, in the instant case, the conveyance was not spouse to spouse, but, rather, sister to brother.

In an action to reform a deed so as to name an executor instead of the estate of a person known to be deceased as grantee, evidence as to negotiations between the grantors and the executor leading up to execution of the deed and the conduct of the parties at the time the deed was executed and thereafter are examined to discern the parties' intent. *Fisher v. Standard Investment Co., supra.*

In *Jacobson v. Forster*, 138 Neb. 452, 293 N.W. 336 (1940), the plaintiff instituted an action against the children by a former marriage of his deceased wife and their spouses to have her name stricken from a warranty deed naming the plaintiff and his deceased wife as grantees. As here, the plaintiff sought the court's decree that neither the deceased wife nor her children, as her heirs, had any actual interest in the property. The petition alleged that the wife's name had been inserted as a grantee by mistake on the part of the scrivener and that the plaintiff did not discover that fact until 4 years later, when, on the wife's death, her children sought to have a one-half interest in the property administered as part of her estate. The trial court denied the plaintiff's right to reformation on the ground that his proof of the alleged mistake was not sufficiently clear, convincing, and satisfactory to meet the standards required for the reformation of an instrument, which result was affirmed on appeal.

From these cases, we conclude that the absolute rule that the Lobbs advocate is not correct and that the matter of discovery and whether there was a mutual mistake involves examination of the facts which surround the deed and how the parties conducted themselves thereafter. Thus, we continue to focus on the facts, both predeed and postdeed.

After Ruth and Kenneth's father died, Ruth acted as the "agent" for all of the land which she and Kenneth had inherited. John Bauer, who leased the farm for growing crops, kept Ruth informed about the farm's operations, notified her when bills needed to be paid, and notified her when crops were ready for sale. Ruth, who lived in Nebraska, would sell the crops and

would send the necessary tax documents and the year's profits to Kenneth alone, who lived in Utah until his death. This practice continued after Kenneth married Lois. After Kenneth's death, Ruth did not send the farm's earnings to Lois. After Lois' death, Ruth put the money in the account for Kenneth's estate. Lois was not involved in the management of the farm before or after sections 9 and 19 were divided out and received no money from the farm's operation, and there is no evidence whatsoever that she ever considered herself an owner of section 9. Bauer testified that he did not know Lois and never had any contact with her. And as further proof of the tenuous nature of the Lobbs' claim that there was no mutual mistake, the Lobbs asserted no ownership claim until Tim approached them for a quitclaim deed to correct Ruth's deed. In other words, there is no inference permissible from the record that Lois had ever suggested to her children that she owned land in Nebraska.

When Ruth began to have financial difficulty, she contacted Kenneth to request that they arrange ownership of their land so that she could sell section 19. Ruth testified that she had no contact or discussion with Lois regarding this transaction, while it was occurring or thereafter. Ruth testified that she intended to continue to take care of the land for Kenneth after the transfer, that she had intended to transfer section 9 solely to Kenneth, and that it was her family's desire that the land would always be in the Eisenhart family estate. The conduct of the parties from the death of Ruth and Kenneth's father right up to when Tim requested the quitclaim deed from the Lobbs clearly and convincingly shows that no one acted as if Lois had any interest in section 9. All of these facts speak loudly to Kenneth's and Ruth's intent that Lois was not receiving any interest in section 9 when Ruth and Kenneth rearranged the legal ownership of the land they inherited from their father. Given the clear and unequivocal conduct of Ruth, Kenneth, and Lois, expressed in a variety of ways, that Lois had no interest in the Eisenhart farm, we find that there was no occasion until after Kenneth's death when the mistake in the deed should have been discovered under the discovery doctrine which tolls the statute of limitations.

The evidence establishes that the mutual mistake was not "discoverable" until its actual discovery by Tim in 1997. The district

court was therefore correct in finding that the statute of limitations does not bar Tim's reformation action. On this record, any other holding would make a mistaken name, date, or legal description "discoverable" as a matter of law on the date of delivery of a deed and render the "discovery doctrine" completely meaningless. Such a result, remembering that this case is in equity, would fly in the face of fundamental fairness—the hallmark of all equity jurisprudence.

*Mutual Mistake.*

A mutual mistake is a belief shared by the parties which is not in accord with the facts. *Resolution Trust Corp. v. Dial Cos.*, 5 Neb. App. 695, 564 N.W.2d 260 (1997). A mutual mistake is one common to both parties in reference to the instrument to be reformed, each party laboring under the same misconception about the instrument, and exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties. *Id.* If incorrect language or wording is inserted by mistake, including a scrivener's mistake, into an instrument intended to reflect the agreement of the parties, such mistake is mutual and contrary to the real intention and agreement of the parties. *Id.*

To reform a written instrument on the ground of mutual mistake, the burden is on the party alleging the mistake to prove that the written instrument does not fully state the agreement or intention of the parties. *Sweley v. Fox*, 135 Neb. 780, 284 N.W. 318 (1939). The precise terms of the contract must be proved. There is always a presumption arising from the instrument itself that it sets forth correctly the agreement of the parties. *Id.* Reformation is never granted on a probability; much stronger and clearer evidence is required than in an ordinary suit for damages. *Id.* To justify reformation of a written instrument requires proof that is clear, convincing, and satisfactory. *Id.* "Clear and convincing evidence" is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999).

The Lobbs argue that the evidence of Kenneth's intent was hearsay erroneously admitted by the trial court, specifically, what Kenneth told Tim. But the evidence we have relied upon in reaching our decision was admitted without hearsay objections, and it, by itself, is sufficient to support the findings of the district court, findings which we also reach. We do not decide whether the evidence the Lobbs characterize as "hearsay" was properly admitted, because the erroneous admission of evidence is harmless error and does not require reversal if such evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Carter,* 255 Neb. 591, 586 N.W.2d 818 (1998); *State v. Chojolan,* 253 Neb. 591, 571 N.W.2d 621 (1997). If the evidence was improperly admitted, this was error without prejudice to the plaintiff and does not change the result. The erroneous admission of evidence in a bench trial is not reversible error if other relevant evidence, properly admitted, sustains the trial court's necessary factual findings; in such case, reversal is warranted only if the record shows that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence. *Main Street Movies v. Wellman,* 251 Neb. 367, 557 N.W.2d 641 (1997). That is not the case here. Further, it has been said in *Miller v. Banner County,* 127 Neb. 690, 691, 256 N.W. 639, 640 (1934): " 'In a case tried to the court, the presumption obtains that the court, in arriving at a decision, will consider such evidence only as is competent and relevant, and this court will not reverse a case so tried because other evidence was admitted.' " An appellate court is not obligated to engage in an analysis which is not necessary to adjudicate the case and controversy before it. *Smith v. Goodyear Tire & Rubber Co.,* 10 Neb. App. 666, 636 N.W.2d 884 (2001). This doctrine applies to the objection to hearsay evidence about Tim's conversations with Kenneth about his intent concerning the land at issue which were said to have occurred after the divorce during Kenneth's final illness.

The evidence which clearly and convincingly supports Tim's claim that there was a mutual mistake in placing Lois' name on the deed to section 9 is fully detailed in the *"Statute of Limitations"* section of this opinion, and we need not repeat it here. As said earlier, the evidence shows that the mistake was

not "discoverable" in the eyes of the law until after Kenneth's death. Equally clear and convincing is the evidence that the mistake was a mutual mistake under the law, making reformation and quiet title the appropriate remedies. We affirm the district court's judgment in all respects.

AFFIRMED.